**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

        vs.                            Case No. 1:21-cr-00997- KWR

MICHAEL ANTHONY MONTOYA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant's Opposed Motion to Dismiss the Indictment Due to Pre-Indictment and Post-Indictment Delay (**Doc. 53**). The Court previously held an evidentiary hearing on this matter on February 1, 2024, and the parties completed briefing their written closing arguments on March 26, 2024. **Docs. 104; 111; 113.** After reviewing the parties' briefings, the evidence developed at the hearing, and the relevant law, the Court finds that the Defendant's motion is not well taken, and therefore, is **DENIED**.

### FACTUAL BACKGROUND

In 2019, Defendant Michael Anthony Montoya was on probation for several New Mexico state convictions related to the trafficking of controlled substances and firearm possession. **Docs. 15 at 16; 53 at 20.** On December 30, 2019, the Defendant's probation officers conducted a field visit to Mr. Montoya's residence, a Motel 6 room in Albuquerque. **Doc. 53 at 2, 21.** During a walk-through of the room, the probation officers observed a silver machete, scales, clear plastic bags, and suboxone. *Id.* The probation officers searched the room further, finding two loaded firearms under a mattress, and arrested Mr. Montoya for violating the terms of his probation

1

agreement. *Id.* **at 21-23.** The guns were confiscated by a New Mexico state supervisory probation officer and FBI Violent Crimes Task Force Officer, Michael Hallberg. *Id.* Officer Hallberg transferred the firearms to the Federal Bureau of Investigation (FBI) four days later on January 3, 2020. *Id.* **at 18.** FBI Agent Jordan Spaeth "test-fired the firearms, and they functioned properly." *Id.*

On January 10, 2020, Mr. Montoya was interviewed at the Bernalillo County Metropolitan Detention Center ("MDC"). **Doc. 55 at 2.** Agent Spaeth collected Mr. Montoya's DNA via a buccal swab during the interview. **Doc. 110 at 51.** Later in the interview,[1] Mr. Montoya allegedly admitted that "(1) he knew he was a felon, having gone to prison for drug trafficking and aggravated battery, (2) both pistols found under his mattress were his, further explaining how he obtained them." **Doc. 60 at 2-3.**

Officer Hallberg initially led the investigation into Mr. Montoya's alleged possession of firearms. *See* **doc. 110 at 28.** In the months after the interview, the investigation stalled due to the onset of the COVID-19 pandemic and Officer Hallberg's resignation from the FBI Violent Crimes Task Force in July 2020. *See* **docs. 100 at 36-37; 110 at 37; Def. Exh. ES-N.** After Officer Hallberg resigned, Agent Spaeth took charge of the case, sending the guns and the DNA swab to the FBI Laboratory for analysis on August 04, 2020. **Docs. 53 at 26; 110 at 36-38.** After receiving a positive DNA match on the firearms in early November, Agent Spaeth filed a criminal complaint against Mr. Montoya in federal court on November 13, 2020. **Doc. 100 at 38.** On July 15, 2021—eighteen months after he was arrested—the federal government indicted Mr. Montoya for possessing firearms in violation of 18 U.S.C. §§ 922(g)(1) and (g)(3). **Doc. 2.** The

---

[1] There is no recording of this interview; the documentation includes (1) Agent Spaeth's report drafted on June 21, 2021; (2) brief rough handwritten notes taken contemporaneously during the interview; and (3) Officer Hallberg's undated report which was not written on any official form or letterhead. **Docs. 72 at 2, 8-11.**

Defendant was subsequently arraigned in federal court and appointed counsel a year later on July 20, 2022. **Doc. 16**. While the federal investigation took its course, Mr. Montoya was convicted on state charges relating to his possession of controlled substances and was sentenced to five years in prison in May 2020. *See* **def. exh. PD-G; docs. 6; 15 at 17-18.**

Between August 26, 2022, and June 8, 2023, Mr. Montoya's counsel filed four unopposed motions to continue trial.[2] ***See generally* docs. 21, 23, 25, and 27.** On July 16, 2023, Mr. Montoya was appointed new counsel, who filed a fifth unopposed motion to continue trial. **Docs. 42; 44.** On October 2, 2023, Mr. Montoya filed this Opposed Motion to Dismiss the Indictment for Pre-Indictment and Post-Indictment Delay. **Doc. 53.**

## DISCUSSION

Mr. Montoya argues that the eighteen-month delay between his December 30, 2019, arrest for violating his state probation agreement and his July 15, 2021, federal indictment violated his Fifth Amendment due process rights. **Doc. 53 at 3.** Mr. Montoya further argues that the thirty-five-month delay in bringing the case to trial—including the United States' twelve-month delay in arraigning him—violated his Sixth Amendment right to a speedy trial. **Doc. 53 at 10.** For these two reasons, the Defendant requests this Court dismiss the indictment. **Doc. 53 at 15.**

The Court finds that the Defendant's due process rights were not violated because he did not suffer any actual prejudice due to the pre-indictment delay and that the delay was not a purposeful decision by the United States to gain a tactical advantage over Mr. Montoya. *See United States v. Garcia*, 74 F.4th 1073, 1096 (10th Cir. 2023). Further, applying the *Barker* factors, the Court finds that the post-indictment delay did not violate Mr. Montoya's Sixth

---

[2] Mr. Montoya's initial court-appointed counsel requested leave to withdraw due to a breakdown in the attorney-client relationship. **Docs. 39, 41, 42.**

Amendment right to a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 530–32 (1972). The Court therefore declines to dismiss the indictment.

## I.    Mr. Montoya's due process rights were not violated by the United States' delay in bringing the indictment.

### A.  Legal Standard

The Government's delay in indicting a defendant "solely to gain tactical advantage over the accused" deviates from the standards of fair play and decency required by the Fifth Amendment Due Process Clause. *United States v. Lovasco*, 431 U.S. 783, 795 (1977). Indictments brought within the statute of limitations are presumptively reasonable, regardless of the length of delay. *Id.* at 789 ("[S]tatutes of limitations, which provide predictable, legislatively enacted limits on prosecutorial delay, provide the primary guarantee against bringing overly stale criminal charges.") (internal quotations and citations omitted); *Garcia*, 74 F.4th at 1096; *United States v. Revada*, 574 F.2d 1047, 1048 (10th Cir. 1978); *United States v. Marion*, 404 U.S. at 307, 324 (1971). Therefore, because "statutes of limitations do not fully define defendants' rights concerning events occurring before the indictment," the Due Process Clause "has a limited role to play in protecting against oppressive delay." *Lovasco*, 431 U.S. at 788. To show that pre-indictment delay violated his due process rights, a defendant must demonstrate that (1) he suffered actual prejudice resulting from pre-indictment delay and (2) the government purposefully designed the delay to gain tactical advantage or to harass the defendant. *Garcia*, 74 F.4th at 1096 (quoting *Revada*, 574 F.2d at 1048).

To meet the due process test's first prong, the defendant has the burden to demonstrate show that the pre-indictment delay resulted in actual prejudice—that is, "definitive and not speculative prejudice"—that violates fundamental concepts of justice. *Id.* at 1096, 1099-1100; *United States v. Colonna*, 360 F.3d 1169, 1177 (10th Cir. 2004) (overruled on other grounds by

*Henderson v. United States*, 575 U.S. 622 (2015)). The most common ways defendants demonstrate prejudice is through lost evidence or missing witnesses. *Garcia*, 74 F.4th at 1103. When arguing that the delay caused evidence to be lost, the defendant must make a connection between the lost evidence and a concrete negative impact on the defense of the case. *Id*. When arguing that the delay caused witnesses to go missing or become unavailable, the defendant must specifically describe how the missing witnesses would have aided his defense. *United States v. Jenkins*, 701 F.2d 850, 855 (10th Cir. 1983) (overruled on other grounds by *Batson v. Kentucky*, 476 U.S. 79, 106 (1986)).

To demonstrate the second prong of the due process test, the defendant must show that the government delayed bringing an indictment to gain a tactical advantage over the defendant. *Revada*, 574 F.2d at 1048. Defendants need not show that the government had a "subjective sinister motive" in their delay, only that the government made a "judgment about how it can best proceed with litigation to gain an advantage over the defendant and, as a result of that judgment, an indictment is delayed." *Mitchell v. Watkins*, 252 Fed. Appx. 874, 880 (10th Cir. 2007) (unpublished); *United States v. Foxman*, 87 F.3d 1220, 1223 n.2 (11th Cir. 1996). "Something more than ordinary negligence on the part of government representatives must be shown, no matter how high the actual proof of prejudice is. The government's delay must be intentional and purposeful." *United States v. Woodard*, 817 Fed. Appx. 626, 628 (10th Cir. 2020) (unpublished) (quoting *United States* v. *Comosona*, 614 F.2d 695, 696 n.1 (10th Cir. 1980)). Therefore, tactical delays are distinct from investigative delays; investigative delays notably do not deprive an accused of due process, even if the accused is prejudiced by lapse of time. *Garcia*, 74 F.4th at 1105; *Lovasco*, 431 U.S. at 795.

Even when a defendant successfully fulfills both prongs of the test, he is not guaranteed dismissal of the indictment. *Comosona*, 614 F.2d at 696. Once a due process violation is established, the trial court must apply a burden-shifting test to determine if the appropriate remedy for the established due process violation is the dismissal of the indictment: (1) a demonstration of actual prejudice to the defendant resulting from the delay, like loss or impairment in the use of witnesses or physical evidence trial; (2) the length of the delay; and (3) the government's reasoning for the delay. *Garcia*, 74 F.4th at 1096 (quoting *Comosona*, 614 F.2d at 696).

### B. Mr. Montoya fails to show actual prejudice or that the government gained a tactical advantage because of the delay.

Mr. Montoya is charged with one count of violating 18 U.S.C. §§ 922(g)(1) and 922(g)(3)—non-capital federal crimes—which have a statute of limitations of five years. *See* 18 U.S.C. § 3282(a); *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010). The United States indicted Mr. Montoya on July 15, 2021, for his alleged possession of firearms on December 30, 2019. ***See* doc. 2**. Because the indictment occurred within the five-year statute of limitations, the delay is presumptively reasonable. *See Lovasco*, 431 U.S. at 789; *Garcia*, 74 F.4th at 1099. Therefore, to prove a due process violation, Mr. Montoya must demonstrate that (1) the delay actually prejudiced him and (2) the government purposefully delayed the indictment for a tactical advantage or harassment. ***See* doc. 60 at 4-5;** *Garcia*, 74 F.4th at 1096; *Revada*, 574 F.2d at 1048; *Marion*, 404 U.S. at 324. Because he fails do so, Mr. Montoya cannot demonstrate that his due process rights were violated. *See id.* Without a prima facie due process violation, this Court declines to conduct the burden-shifting test and dismiss the indictment. *See Comosona*, 614 F.2d at 696; *Garcia*, 74 F.4th at 1096.

i.    Actual Prejudice

Mr. Montoya argues that the preindictment delay prejudiced him because (1) the delay caused evidence and witnesses for his third-party culpability defense to become unavailable and (2) the delay in bringing federal charges robbed him of the opportunity to shorten his state sentence by "at least a year, maybe two." **Docs. 53 at 4-5, 9; 110 at 96; 113 at 5.** Mr. Montoya must demonstrate that the prejudice he suffered in both cases was definitive and not speculative. *See Garcia*, 74 F.4th at 1096.

First, the Defendant argues that the government's delay in bringing the indictment hindered his third-party culpability defense in several ways. **Docs. 53 at 4; 113 at 3.** Mr. Montoya contends that his third-party defense centered around Weezy, an individual known to sell guns who also resided at the motel. **Doc. 113 at 3-4.** As evidence of third-party involvement, Mr. Montoya says that he notified Officer Hallberg and Agent Spaeth of Weezy's participation during the MDC interview. **Doc. 53 at 4; 71 at 4**. Mr. Montoya argues that the delay caused Weezy, a key witness, to become unavailable to him, as well as security footage that purportedly showed Weezy leaving Mr. Montoya's room shortly after probation officers arrived for the field visit. *Id.* In response, the United States argues that the delay did not actually prejudice the Defendant because he could have pursued the evidence he now seeks as part of his state proceedings related to his probation violation. **Doc. 60 at 6; 112 at 2-3.** The Court agrees.

In early 2020, Mr. Montoya faced state charges for his assorted probation violations, including possessing the same firearms at issue in this case. **Doc. 53 at 19-20.** As part of his preparation for his defense for those charges, Mr. Montoya had the opportunity to access the motel surveillance video he says shows Weezy leaving his room and guest records that prove Weezy resided at the motel. **Doc. 110 at 93.** The Defendant's investigator testified that these

video recordings would have been deleted by early March 2020, an entire month and a half before Mr. Montoya pled guilty to violating the terms of his parole and was incarcerated on state drug trafficking state charges. ***See* doc. 110 at 137-138, 43;** *Garcia*, 74 F.4th at 1103.

Mr. Montoya also cannot demonstrate that the delay caused Weezy to become unavailable to him, prejudicing his defense. ***See* doc. 53 at 4-5; 71 at 4-5.** Mr. Montoya makes no arguments specifying what he expected Weezy to testify to and how that testimony might help the Defendant. ***See* docs. 53; 71; 113***; Garcia*, 74 F.4th at 1101-02; *Jenkins*, 701 F.2d at 855. Given that Weezy was arrested on federal drug trafficking and firearm possession charges less than a year after Mr. Montoya, this Court finds it far from definitive that Weezy would have provided anything helpful to Mr. Montoya's case. *See Garcia*, 74 F.4th at 1096; *Jenkins*, 701 F.2d at 855; *United States v. Trujillo*, 1:20-cr-01773, Doc. 17 (D.N.M. Sept. 18, 2020).[3]

Mr. Montoya argues that the United States' delay in bringing an indictment caused MDC surveillance recordings of Mr. Montoya's interview to be deleted, impairing his ability to raise constitutional arguments relating to the coercive nature of the interview. **Doc. 53 at 6 n.5, 7-8; 113**. The Court is not convinced that these recordings existed. The record is clear that the MDC has video surveillance and requires the retention of those recordings for ninety days. **Doc. 110 at 146-47; def. exh. PD-K.** However, Defendant has not established that the Security Threat Intelligence Unit (STIU) office—the location of Mr. Montoya's interview and the base of MDC's internal intelligence team—had surveillance video capacity.[4] ***See* doc. 110 at 144-146.**

---

[3] The initial charges against Weezy were dropped on April 21, 2021, but he was later the subject of a superseding indictment and pled guilty to those charges in March 2024. *Trujillo*, 1:20-cr-01773, Doc. 45 (D.N.M. April 21, 2021): *United States v. Trujillo*, 1:20-cr-01775, Docs. 48, 399 (D.N.M. Mar. 19, 2024).

[4] Agent Spaeth described the STIU office as follows: "these are MDC, essentially gang officers who talk to inmates, and the assisted us in our cases … that office is, I would say, six computers, desks…It's just an office. So there's art, different things on the wall. I mean, people have chairs in there and definitely not an interrogation room." **Doc. 110 at 23.** It is unclear whether an internal office for MDC employees would have video surveillance set up. Rick Abetya, the Defendant's investigator, also testified that he had never seen surveillance video from the STIU offices in the MDC but had requested surveillance footage from other areas of the MDC. **See doc. 110 at 144, 146-47.**

Even if the video existed, the Defendant had the opportunity to notify his counsel in his state probation violation case about the coercive circumstances of the interview before the video retention period expired. *See* **def. exh. PD-K; 110 at 144-46.** Because Mr. Montoya had the opportunity to preserve the Motel 6 surveillance video, guest records, witness testimony from Weezy and the MDC video surveillance footage, but did not choose to do so, he cannot claim that he was prejudiced by the Government's pre-indictment delay. See *Garcia*, 74 F.4th at 1103; *Jenkins*, 701 F.2d at 855.

Mr. Montoya also argues that the delayed indictment prejudiced him by preventing him from serving his state and federal charges concurrently, receiving credit for time served on his state charges, and accessing services that would minimize his state prison sentence because of a federal detainer. **Doc. 53 at 9.** In the Tenth Circuit, however, any prejudice arising out of a consecutive, not concurrent, sentence is speculative. *United States v. Madden*, 682 F.3d 920, 929-30 (10th Cir. 2012).

Similarly speculative are Mr. Montoya's claims that a federal detainer limited his ability to access programming that could have reduced his state sentence. **Doc. 113 at 4-5.** Mr. Montoya testified that he was incarcerated at a level III and at that level "programs are limited." **Doc. 110 at 94.** At lower levels, inmates have more freedom and access to programming, which can lead to a reduction in the amount of time served; after a prisoner completes these programs, the Defendant testified that the Corrections Department "give[s] you a lump sum which takes, like, 90 days, 30 days, stuff off your sentence." *Id.* The record reflects that Mr. Montoya was denied a level II transfer because of an NCIC felony detainer on April 21, 2021.[5] *See* **Def. Exh. PD-J.**

---

[5] Agent Spaeth sent an FBI Detainer Form regarding Mr. Montoya to the Northeast New Mexico Detention Facility on August 19, 2021, about one month after Mr. Montoya was indicted by a federal grand jury. *See* **Def. Exh. PD-1; doc. 2.** It is not clear when the NCIC detainer was put into place.

Mr. Montoya claims that this denial was solely because of the detainer, which extended Mr. Montoya's stay in prison by "at least a year, maybe two." **Doc. 110 at 96.**

Mr. Montoya's claims that he would have been released from state custody but for the presence of the federal detainer are speculative. *See Madden*, 682 F.3d at 929-30. Mr. Montoya testified that he had three points[6] when his transfer was denied, but the committee hearing notes suggest that he had seven points. *Id.* **at 95-96**; **Def. Exh. PD-J.** Without a more developed record, the Court is not convinced that Mr. Montoya's transfer denial was solely due to the NCIC detainer. *Id.* Finally, even if Mr. Montoya was transferred to the lower custody level, there are any number of reasons that he would serve the same sentence length: changes in corrections department policy, a transfer back to a higher level, infractions, or Mr. Montoya's failure to complete any of the programming available to him. Therefore, the prejudice that Mr. Montoya suffered related to the presence of a federal detainer is too speculative to establish actual prejudice. *See Madden*, 682 F.3d at 929-930.

### ii.    Tactical Advantage

The second prong of the pre-indictment delay due process test is whether the Defendant can demonstrate that the Government delayed bringing the indictment to gain a tactical advantage. *Revada*, 574 F.2d at 1048. Here, Mr. Montoya characterizes the Government's delay as "more than negligent, and egregious even if not sinister," and aimed at coercing him—then withdrawing from narcotics—to make inculpatory statements without his attorney present. **Doc. 53 at 5-6.**

---

[6] Mr. Montoya testified, "It's your -- it's a six-month review. Every six months they go over your custody level and if your points go down, you can go to a Level 2, Level 1, depending on your points. The lower points you go, the more abilities you have, the more you can move around, the more programs are available to you. I believe when I signed this, I only had three points, and they told me I was eligible for Level 1, but I couldn't go because I had an FBI detainer." **Doc. 110 at 95.**

Yet, the Defendant has not demonstrated that the Government made a deliberate and tactical decision to delay indicting him so that they could speak to him without an attorney present. ***See generally* docs. 55; 71; 113.** The MDC interview took place on January 10, 2020, just eleven days after the Defendant was arrested for violating his state probation agreement. **Def. exh. ES-G.** At that time, there was no federal case, because the United States Attorney's Office had not yet accepted Mr. Montoya's case for prosecution. **Doc. 110 at 22.** *See Revada*, 574 F.2d at 1048; *Mitchell,* 252 Fed. Appx. at 880 (unpublished). The record does not indicate that Agent Spaeth and Officer Hallberg acted in a way that would delay indicting Mr. Montoya so that the Defendant could not access the video surveillance evidence or critical witnesses for his case; in fact, it is not clear that Agent Spaeth was aware of the Motel 6 surveillance video or the purported MDC surveillance video of the interview. ***See generally* doc. 110.** Nor does the Defendant connect the government's delay in bringing the indictment to a prosecutorial judgment call to make footage of the interview, if it ever existed, unavailable to Mr. Montoya. ***See* docs. 53, 71, 113;** *Mitchell*, 252 Fed. Appx. at 880 (unpublished).

Instead, it appears that the initial delays related to the indictment were the result of Officer Hallberg's resignation from the FBI task force, Officer Hallberg's failure to send the DNA for testing immediately, the onset of the COVID-19 pandemic, and Agent Spaeth's perhaps misinformed notion that the U.S. Attorney's office required a positive DNA match to prosecute the case. **Docs. 110 at 21-22, 35-38; 111 at 4.** After Officer Hallberg turned over the recovered firearms to the FBI on January 3, 2020, Agent Spaeth spoke with the United States Attorney's Office; his takeaway from that conversation was that the U.S. Attorney's office needed a positive DNA match connecting Mr. Montoya to the firearms to accept the case. **Doc. 110 at 21-22.** When Agent Spaeth took over the case after Officer Hallberg's resignation, he immediately sent

the guns and the DNA buccal swab out for comparison testing on July 27, 2020. **Doc. 110 at 37-38.** He then received the lab results in early November and subsequently filed the criminal complaint on November 13, 2020. *Id.* **at 38-39.**

The Defendant's criticisms about the FBI's investigation of Mr. Montoya—specifically their decision to obtain DNA evidence when Mr. Montoya made inculpatory statements during the MDC interview—do not rise to a due process violation. ***See*** **doc. 113 at 5;** *Lovasco,* 431 U.S. at 795. Even if Agent Spaeth was mistaken about what evidence was required to prosecute Mr. Montoya, his decision to gather DNA evidence that linked Mr. Montoya to the firearms was a reasonable investigative choice, despite lengthening the time it took to indict Mr. Montoya. *See Garcia*, 74 F.4th at 1105; *Lovasco*, 431 U.S. at 795.

While the FBI may have taken an unusually long time to investigate Mr. Montoya's case under normal circumstances, this Court recognizes the myriad of challenges that the early stages of the COVID-19 pandemic posed to the efficient investigation of this case: Agent Spaeth's illness, administrative orders that continued or suspended grand juries, a "burgeoning backlog of cases," and investigative delays. ***See*** **doc. 71 at 3-4;** Administrative Order, 20-mc-0004-22 (D.N.M. June 9, 2020). Mr. Montoya argues that there were more than fifty grand juries impaneled between Mr. Montoya's arrest and his indictment; however, this Court counts just twelve Albuquerque grand juries impaneled between November 2020—when Agent Spaeth filed the criminal complaint against Mr. Montoya—and July 2021 when Mr. Montoya was indicted. ***See*** **docs. 113 at 6; def. Exh. PD-L.** Given the constraints of a global pandemic, the United States acted relatively quickly to indict Mr. Montoya once it had the DNA match in hand. ***See*** **doc. 110 at 38.**

Mr. Montoya calls into question the credibility of Officer Hallberg and Agent Spaeth's testimony about who the lead investigator on the case was initially. **Docs. 110 at 36, 168-69; 113 at 5-6.** The Court finds Agent Spaeth's testimony that Officer Hallberg was the initial lead investigator credible; for example, Agent Spaeth's initially brief documentation of the interview suggested that he believed Officer Hallberg would be documenting the case more intensively. **Doc. 110 at 35-37.** Further, while Officer Hallberg may have failed to properly document the interview or request DNA testing immediately, his actions do not rise above ordinary negligence. *See Woodard*, 817 Fed. Appx. at 628 (unpublished) (quoting *Comosona*, 614 F.2d at 696 n.1). After Agent Spaeth inherited the case in July 2020, the record reflects that Agent Spaeth reasonably pursued this case despite the challenges posed by the COVID-19 pandemic. ***See* doc. 110 at 36-40.**

Mr. Montoya has not demonstrated that the government's delay in indicting him was an intentional and purposeful decision to gain an advantage over him. *See Mitchell*, 252 Fed. Appx. at 880; *Comosona*, 614 F.2d at 696 n.1.Therefore, Mr. Montoya has not met his burden of proof to establish that the Government unreasonably and oppressively delayed its prosecution of the case. *Lovasco*, 431 U.S. at 788; *Garcia*, 74 F.4th 1073, 1096. Because the Defendant has not demonstrated a prima facie due process violation, this Court will not conduct the burden-shifting analysis to determine whether the dismissal of the indictment is appropriate. *Comosona*, 614 F.2d at 696; *Garcia*, 74 F.4th at 1096.  The Court declines to dismiss the indictment due to pre-indictment delay.

## II.   The Defendant's Sixth Amendment right to a speedy trial was not violated by post-indictment delay.

The Sixth Amendment guarantees that defendants in criminal cases "shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "Although the right is somewhat

13

amorphous, the remedy is severe: dismissal of the indictment." *United States v. Margheim*, 770 F.3d 1312, 1325 (10th Cir. 2014) (quoting *United States v. Seltzer*, 595 F.3d 1170, 1175 (10th Cir. 2010)).

The constitutional right to a speedy trial "attaches when the defendant is arrested or indicted, whichever comes first." *United States v. Black*, 830 F.3d 1099, 1112 (10th Cir. 2016) (citations omitted); *United States v. Banks*, 761 F.3d 1163, 1181 (10th Cir. 2014). "Arrest" means federal arrest. *See United States v. Allen*, 986 F.2d 1354, 1356 (10th Cir. 1993). Thus, the Sixth Amendment right to a speedy trial attaches at the point of federal criminal charges and is "not triggered by prior state arrest or indictment." *Allen*, 986 F.2d at 1356; *see also Madden,* 682 F.3d at 930 (quoting *United States v. Gomez*, 67 F.3d 1515, 1521 (10th Cir. 1995) ("Arrest by state authorities on state charges does not trigger the speedy trial provisions of the Federal Constitution.").

To determine if there is a Sixth Amendment speedy trial violation, this Court must analyze the delay using a four-factor balancing test set out in *Barker v. Wingo*: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Margheim*, 770 F.3d at 1325–26 (quoting *United States v. Yehling*, 456 F.3d 1236, 1243 (10th Cir. 2006)); *Barker v. Wingo*, 407 U.S. 514, 530–32 (1972).

### A. The length of the delay is presumptively prejudicial.

The first *Barker* factor is the length of the delay. 407 U.S. at 530. "Delays approaching one year generally satisfy presumptive prejudice." *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006). If Defendant shows that a delay is presumptively prejudicial, the Court must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett*, 505 U.S. at 652. "The longer the delay, the more likely the first factor will weigh in the defendant's favor." *United States v. Larson*, 627 F.3d

14

1198, 1208 (10th Cir. 2010). The length of the trial also "functions as a triggering mechanism, and the remaining three [*Barker*] factors need only be assessed if the delay is long enough to be presumptively prejudicial." *Id.* at 1326; *United States v. Hicks*, 779 F.3d 1163, 1167 (10th Cir. 2015).

When analyzing the length of delay, a trial court should consider the nature and complexity of the charges. *Seltzer,* 595 F.3d at 1176 (finding that even minor delays can be untimely where the charges are straightforward, like Seltzer's counterfeit, drug possession, and felon in possession of a firearm charges). *See also Larson*, 627 F.3d at 1209 (finding that a thirty-one-month delay in trying a defendant's case is "approximately two-and-a-half times the ordinary period of delay" which is presumptively prejudicial); *Gomez*, 67 F.3d at 1521 (finding that a delay of twelve and one-half months was not "especially egregious," but still triggers consideration of the other *Barker* factors given the straightforward drug prosecution and single defendant). Consequently, less delay is tolerated for ordinary street crimes, and more delay for complex conspiracy charges, and the presumption that pretrial delay has prejudiced the accused intensifies over time. *See Batie*, 433 F.3d at 1290; *Doggett*, 505 U.S. at 652.

Mr. Montoya's right to a speedy trial attached when he was indicted on federal charges on July 15, 2021. **Doc. 2.** *See Black*, 830 F.3d at 1112; *Banks*, 761 F.3d at 1181. He was arraigned on July 22, 2022. **Docs. 16; 53 at 11.** Trial is currently set for June 12, 2024. **Doc. 106.** The total delay between the indictment and the current trial setting is approximately thirty-five (35) months.

When considering the length of the delay, this Court must measure the total delay, not just the delay between Mr. Montoya's indictment and arraignment. ***See* doc. 60 at 7**; *Margheim*, 770 F.3d at 1326 (measuring the delay between the indictment and the start of trial). Under

*Barker*, a delay is presumptively prejudicial if it "approaches" a year; because the length of

delay, in this case, is nearly three times longer than that, the Court finds that the length of the

delay is presumptively prejudicial. ***See* docs. 2, 106;** *Larson*, 627 F.3d at 1209; *Hicks*, 779 F.3d

at 1167.

Next, the Court must determine whether the charges could justify a delay longer than a

year. *See Seltzer*, 595 F.3d at 1176; *Gomez*, 67 F.3d at 1521. The Defendant was indicted on a

single count of being a prohibited person in possession of a firearm and ammunition, an ordinary

street crime. ***See* doc. 2;** *See Batie*, 433 F.3d at 1290; *Doggett*, 505 U.S. at 652.

*Seltzer*, 595 F.3d at 1176. The investigation into Mr. Montoya's possession of the firearms was

straightforward and did not require significant investigatory resources: the interview on January

10, 2020, Agent Spaeth test-firing the firearms, and comparing Mr. Montoya's DNA with DNA

collected from the gun. ***See* doc. 60**; *Seltzer,* 595 F.3d at 1176; *Larson*, 627 F.3d at 1209. The

length of the delay, therefore, weighs strongly in favor of the Defendant and further

consideration of the three *Barker* factors. *See Gomez*, 67 F. 3d at 1521.

### B. The reasons for the delay weigh moderately against the United States.

"The second *Barker* factor—the reason for the delay—is the flag all litigants seek to

capture." *Margheim*, 770 F.3d at 1326 (quoting *United States v. Loud Hawk*, 474 U.S. 302, 315

(2014)). "At this juncture, the court must assess the reasons offered by the government for not

bringing the defendant to trial in a timely fashion." *Margheim*, 770 F.3d at 1326.

The reasons for the post-indictment delay weigh against the government in proportion to

the degree that the government caused the delay. *Batie*, 433 F.3d at 1291. For example,

negligence or crowded court dockets weigh against the United States, but not as much as delays

sought deliberately to seek an improper advantage. *Barker*, 407 U.S. at 531; *Bati*e, 433 F.3d at

1291. Moreover, continuances and other motions filed by a defendant do not weigh against the

government. *Bati*e, 433 F.3d at 1291. The court must also consider whether the delays resulted from the complexity of prosecuting a case, plea negotiations, or continuances to further ends of justice. *Margheim*, 770 F.3d at 1326-28.

In Mr. Montoya's case, the post-indictment delay can be separated into two periods: (1) the twelve months between the indictment and the arraignment on July 22, 2022, and (2) the period from the arraignment to the present. ***See* docs. 2; 16**. During the first period, it is clear that the government was the sole cause of the delay; Mr. Montoya was in state custody and was unaware of his federal indictment until his arraignment. ***See* doc. 4;** *Batie*, 433 at 1291. The United States says its motive for the delay was benign and "largely attributable to the COVID-19 pandemic and the difficulty in completing already-initiated prosecutions as the court system re-opened for hearings and trials." **Doc. 60 at 8**. The United States also argues that it prioritized the prosecution of defendants already in federal custody over defendants like Mr. Montoya, who was in state custody. ***Id.***

The Government's investigation into Mr. Montoya was straightforward and largely completed before Mr. Montoya was indicted in July 2021. ***See* doc. 110 at 36-40.** While the COVID-19 pandemic certainly posed challenges to the prosecution of cases, the Government has not explained why it could not present Mr. Montoya to a federal magistrate for twelve months after the indictment. ***See* doc. 16; 60 at 8.** The United States' justification for prioritizing the prosecution of other defendants in federal custody over Mr. Montoya does not conform to the Sixth Amendment right to a speedy trial. *See Seltzer*, 595 F.3d at 1176. Even though Mr. Montoya served a separate state sentence during this period, the United States had a duty to expeditiously notify the district court that the Defendant should be arraigned and appointed counsel after indicting him. *See id.* at 1177-78 (quoting *United States v. Battis*, 589 F.3d 673,

680 (3d. Cir. 2009)); *Jackson v. Ray*, 390 F.3d 1254, 1262 (10th Cir. 2004). While the Government's reasons for delay during the first period were not for nefarious or improper purposes, the government acknowledges that it made a conscious decision to deprioritize Mr. Montoya's case. **Doc. 60 at 8**. *See Batie*, 433 F.3d at 1291. Therefore, the reason for the delay during this period weighs heavily against the United States. *See Margheim*, 770 F.3d at 1326; *Barker*, 407 U.S. at 531; *Bati*e, 433 F.3d at 1291.

Responsibility for the second period of delay—from the arraignment to the present—resides with the Defendant. *See Batie*, 433 F.3d at 1291; *Larson*, 627 F.3d at 1209-10; *United States v. Abdush-Shakur*, 465 F.3d 458, 465 (10th Cir. 2006) ("Delays attributable to the defendant do not weigh against the government."). During this period, Mr. Montoya filed five uncontested motions to continue and changed counsel. **Docs. 21, 23, 25, 27, 42, 46.** Mr. Montoya argues, and the Court agrees, that two of these continuances should not count against the Defendant because they allowed Mr. Montoya's previous counsel and current counsel to review discovery and prepare for trial. **Doc. 53 at 12.** The remaining three continuances resulted in an additional delay of seven months; they weighed against the Defendant even if the reasons for these continuances were plea negotiations and disagreements with his first counsel. ***See* doc. 53 at 12-13;** *Margheim*, 770 F.3d at 1326-28.

The second *Barker* factor weighs moderately against the United States. *See* 407 U.S. at 530–32. Since the United States decided to prioritize other cases over Mr. Montoya's case, this active decision should weigh more heavily against the United States than negligence or routine overloading of the courts. *See Seltzer*, 595 F.3d at 1177-78; *Barker*, 407 U.S. at 531; *Bati*e, 433 F.3d at 1291. The Defendant's numerous continuances weigh against him despite the ends of justice reasons for the delay. *See Bati*e, 433 F.3d at 1291; *Margheim*, 770 F.3d at 1326-28.

**C.  Mr. Montoya Did Not Assert His Speedy Trial Right.**

The third *Barker* factor is whether and in what manner the Defendant has asserted his right to a speedy trial. 407 U.S. at 531-32 ("Failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."). A defendant is not responsible for asserting the right until they know the about indictment. *See Barker*, 407 U.S. at 507 (the defendant has no duty to bring himself to trial, and the State has the duty of ensuring the trial is consistent with due process); *Doggett*, 505 U.S. at 653-54 (where a defendant was unaware indictment before arrest, he "is not to be taxed for invoking his right to a speedy trial right only after his arrest.").

However, once the defendant is arraigned, the Court must analyze whether the defendant's behavior during litigation manifests a desire to go to trial quickly. *Batie*, 433 F.3d at 1291. Delays attributable to the defendant, including continuances filed by the defendant, do not support a Sixth Amendment violation. *United States v. Toombs*, 574 F. 3d 1262, 1274-75 (10th Cir. 2009); *United States v. Dirden*, 38 F.3d 1131, 1138 (10th Cir. 1994); *Abdush-Shakur*, 465 F.3d at 465. In other words, a defendant's actual conduct and tactical litigation decisions after his arraignment contradicting his assertion of his desire for a speedy trial will weigh against him. *See United States v. Tranakos*, 911 F.2d 1422, 1429 (10th Cir. 1990) ("We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire.").

The United States argues that this factor weighs heavily against the Defendant because the Defendant first brought up his speedy trial right in his October 2023 motion after filing five motions to continue over the course of a year. **Doc. 60.** Montoya argues in response that (i) the post-arraignment motions were the result of continuous plea negotiations with the Government,

19

(ii) he raised his speedy trial rights during the first substantive and dispositive motions he filed in the case, and (iii) he disagreed with his first counsel about filing these motions, resulting in the breakdown of the attorney-client relationship. **Doc. 53 at 13.**

Mr. Montoya was arraigned a year after his indictment and could not assert his right to a speedy trial during this period. ***See*** **docs. 2, 6, 16;** *Doggett*, 505 U.S. at 653-54. Because the United States bears sole responsibility for this period of delay, the Defendant should not be taxed for not invoking his right to a speedy trial. *See Barker*, 407 U.S. at 507; *Doggett*, 505 U.S. at 653-54. However, Defendant's tactical litigation decisions post-arraignment do not manifest his desire to go to trial; his continuances and engagement in continuous plea negotiations during this period demonstrate that Mr. Montoya was instead trying to avoid trial altogether. *See Tranakos*, 911 F.2d at 1429; *Batie*, 433 F.3d at 1291. Even though Mr. Montoya raised his speedy trial right in his first substantive motions in the case, he did so fifteen months after his arraignment. ***See*** **docs. 16; 53**; *Toombs*, 574 F. 3d at 1274-75; *Dirden*, 38 F.3d at 1138; *Tranakos*, 911 F.2d at 1429. Balancing the defendant's responsibility to raise his speedy trial right before and after the arraignment, this factor weighs moderately against the Defendant. *See Tranakos*, 911 F.2d at 1429.

### D.  Mr. Montoya fails to show any definitive prejudice resulting from the post-indictment delay.

The fourth *Barker* factor is the prejudice to the defendant, considering the interests that the right to a speedy trial protects: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting impairment of defense. *Barker*, 407 U.S. at 532; *Batie*, 433 F.3d at 1292. The defendant has the burden to prove prejudice, which must be definite and not speculative. *Seltzer*, 595 F.3d at 1179; *Margheim*, 770 F.3d at 1329.

"[I]n most circumstances, failure to specify prejudice will eviscerate the defendant's claim." *Margheim*, 770 F.3d at 1329.

Concerning the first interest, Mr. Montoya argues that the post-indictment delay prejudiced him by oppressively increasing his pretrial incarceration in three ways: (1) he was not able to invoke his Speedy Trial Act Right as early as he could have; (2) the delay removed the possibility that his federal sentence could have run concurrently to a state prison term under the Sentencing Guidelines; and (3) the federal detainer placed on him resulted in his incarceration in a higher security level, depriving him of programming and early release. **Docs. 53 at 14-15; 71 at 8-9.**

Mr. Montoya argues the twelve months between his arraignment and indictment inhibited his ability to assert his Speedy Trial Act rights, contributing to his oppressive pre-trial incarceration. **Doc. 71 at 7.** *See Seltzer*, 595 F.3d at 1181. While delay may prevent a defendant from asserting their Speedy Trial Act rights, the fact of the delay is not enough to prove prejudice.[7] *Seltzer*, 595 F.3d at 1181; *United States v. Frias*, 893 F.3d 1268, 1275 (10th Cir. 2018). The defendant must show that he both lost opportunities because of the delay and did not himself contribute to additional delay. *Frias,* 893 F.3d at 1275 ("[t]he wait to assert such a right is implicit in any delay and therefore fails to establish the requisite prejudice necessary to trigger a constitutional violation"); *United States v. Medina*, 918 F.3d 774, 781 (10th Cir. 2019). Here, the Defendant has not demonstrated that he lost any specific opportunities because of the delay. ***See* docs. 53, 71**; *Frias*, 893 F.3d at 274. Moreover, rather than asserting his rights under the

---

[7] The Speedy Trial Act requires that a defendant be tried within seventy days from the filing date of the indictment or from the date on which the defendant appears before a judicial officer, whichever date is later. *United States v. Gonzales*, 137 F.3d 1341, 1432 (10th Cir. 1998).

Speedy Trial Act immediately after his federal arraignment, Mr. Montoya waited fifteen months

to do so for the first time. **See docs.** *16;* **53 at 14.** Finally, Mr. Montoya's five post-arraignment

continuances contributed to additional delay and cut against his argument that his pre-trial

incarceration was oppressive or prejudicial. *See Medina*, 918 F.3d at 782; *Frias*, 893 F.3d at 274.

Mr. Montoya argues that without the delay, any federal sentence would have run

concurrently with his state sentence for relevant conduct under Sentencing Guidelines §

5G1.3(b).[8] **Doc. 53 at 14-15; 71 at 9.** While defendants have a general interest in being tried

promptly, defendants are normally not prejudiced when they lost out on an opportunity to get a

modified state sentence or parole because the federal prosecution was delayed. *Frias*, 893 F.3d at

274; *Madden*, 682 F.3d at 929-30. At the time of his arraignment, the Defendant was in state

custody, serving a five-year sentence for drug possession charges. **Docs. 6; 15 at 17.** Because he

was already incarcerated during the period where the government was most responsible for his

post-indictment delay—between his federal indictment in July 2021 and arraignment in July

2022—his incarceration at the time of indictment on separate state charges is a strong argument

against oppressive pretrial incarceration. *See Seltzer,* 595 F.3d 1179; *Frias*, 893 F.3d at 274.

---

[8] USSG § 5G1.3(b): If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is relevant conduct to the instant offense of conviction under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct), the sentence for the instant offense shall be imposed as follows:

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

(2) the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.

Relevant conduct as defined in USSG § 1B1.3(1)(A) includes all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

Based on the Sentencing Guidelines, the Defendant's firearm possession was likely relevant conduct to his possession of narcotics, meaning that any federal sentence would have been concurrent to his state sentence had federal authorities arraigned him earlier. ***See* docs. 16**; UNITED STATES SENT. GUIDELINES § 5G1.3(b). However, this claim of prejudice is speculative; there is no indication that Mr. Montoya, given his many post-arraignment continuances, would have taken a plea in time to take advantage of a concurrent sentence. ***See* docs. 21; 23; 25; 27;** *Seltzer*, 595 F.3d at 1179; *Margheim*, 770 F.3d at 1329. Moreover, the Tenth Circuit has deemed such prejudice speculative in the inverse—where a federal indictment would have shortened the state sentence. *See Frias*, 893 F.3d at 274.

Finally, Mr. Montoya argues that the presence of a federal detainer kept him at a higher security level, deprived him of programming, and denied him the possibility of early release. **Doc. 71 at 8-9.** Again, the prejudice discussed here is speculative because Montoya has not shown that the existence of the federal detainer significantly lengthened his state sentence. ***See* doc. 71 at 9;** *Seltzer*, 595 F.3d at 1179; *Margheim*, 770 F.3d at 1329. Even if Mr. Montoya was transferred to the lower custody level, there are any number of reasons that he would serve the same sentence length: changes in department policy, a transfer back to a higher level, infractions, or Mr. Montoya's failure to complete any of the programming available to him. *Compare Seltzer*, 595 F.3d 1170 (finding the defendant was prejudiced by a federal detainer because the presence of a detainer interfered with his right to a bond hearing in the state case).

Because a defendant's inability to "adequately prepare his case skews the fairness of the entire system," impairment of the accused's defense is especially significant. *Barker*, 407 U.S. at 532. Impairment of the defense can take several forms, including lost witnesses, lost evidence, and denial of counsel. *Medina*, 918 F.3d at 781; *Barker*, 407 U.S. at 532; *Seltzer*, 595 F.3d at

1180. When asserting prejudice through the loss of witnesses, the defendant must describe with specificity how the missing witness would have aided their defense and whether the defendant had the opportunity to preserve witness testimony. *Margheim*, 770 F.3d at 1331. However, when a defendant is not on notice to preserve testimony or has no real chance, the failure will not be fatal to the defendant's claim of prejudice. *Medina*, 918 F.3d at 782. When asserting prejudice through the loss of evidence, the defendant must demonstrate that the government's delay caused evidence to become unavailable and that it was irretrievable for trial by describing their efforts to locate it. *Id*.

First, Mr. Montoya argues that the denial of counsel over a year after his indictment prejudiced him by delaying his motion to suppress and inhibiting his third-party culpability defense. **Docs. 12; 16; 53 at 15**. The Tenth Circuit previously found that the denial of counsel impaired a defendant's ability to defend and prepare his case, where the defendant had to request counsel, and the defendant went over six months before being appointed counsel. *Seltzer*, 595 F.3d at 1180. However, Mr. Montoya waited over fifteen months after he was appointed counsel to file his motion to suppress evidence, and the evidence related to his third-party culpability defense had disappeared even before his federal indictment. ***See* doc. 16; 55, 110 at 130-35.** Unlike in *Seltzer*, Mr. Montoya was appointed counsel at his arraignment hearing, and the government did not appear *ex parte* before a federal judge while he was unrepresented. *See* 595 F.3d at 1180-81. Therefore, while Mr. Montoya was deprived of counsel for over a year after his indictment, he cannot show that he suffered any specific prejudice related to his lack of counsel. *Id.*

The Defendant also claims that the delay impaired his defense, causing key witnesses and evidence to become unavailable. As Mr. Montoya testified on the stand, he was aware that he was potentially facing state charges for possessing firearms charges after his arrest. **Docs. 55 at 19;**

**110 at 126.** He was, therefore, on notice of the need to preserve evidence—like the Motel 6 surveillance video and guest records—that could have been useful to his defense of that charge. *See Jackson*, 390 F.3d at 1625. Moreover, the Motel 6 surveillance video would have been retained only for sixty days, meaning that they were destroyed fourteen months before Mr. Montoya was even federally indicted. ***See* doc. 2.** Therefore, the government's post-indictment delay did not cause the Defendant to lose access to that surveillance video, even though the surveillance video is now irretrievable. **Doc. 53 at 27.** *See Medina*, 918 F.3d at 782.

Because the Defendant cannot demonstrate definitive prejudice relating either oppressive pretrial incarceration or impairment of his defense, the fourth *Barker* factor weighs heavily against the Defendant. *See* 407 U.S. at 532; *Batie*, 433 F.3d at 1292; *Margheim*, 770 F.3d at 1329.

### E. *Barker* Balancing Test

"Speedy trial claims require a balancing test." *Jackson*, 390 F.3d at 1266. None of the four *Barker* factors is a "necessary or sufficient condition to the finding of a deprivation of a speedy trial." *Batie*, 433 F.3d at 1290; *Seltzer*, 595 F.3d at 1181.

The first *Barker* factor strongly favors Mr. Montoya because the thirty-five-month delay on a straightforward criminal case is presumptively prejudicial and sufficiently lengthy to trigger consideration of the other three *Barker* factors. *See Margheim*, 770 F.3d at 1326; *Larson*, 627 F.3d at 1209; *Gomez*, 67 F. 3d at 1521. The second factor, the reasons for the delay, moderately favors the Defendant after balancing the effects of COVID-19 on judicial efficiency, the government's sole responsibility for twelve months of delay, and the Defendant's multiple ends-of-justice continuances. *See Bati*e, 433 F.3d at 1291; *Margheim*, 770 F.3d at 1326-28. The third factor weighs strongly against the Defendant—despite the Government's twelve-month delay between the indictment and arraignment—because of the Defendant's multiple motions to

continue and his pursuit of a plea deal for nearly a year. *See Barker*, 407 U.S. at 507; *Doggett*, 505 U.S. at 653-54; *Tranakos*, 911 F.2d at 1429. Finally, the Defendant's failure to show definitive prejudice weighs heavily against him. *See Seltzer*, 595 F.3d at 1180. Balancing the *Barker* factors, the Court concludes that Mr. Montoya has not shown that he suffered a Sixth Amendment speedy trial violation. ***See* docs. 53, 71**; *Barker*, 407 U.S. at 507; *Margheim*, 770 F.3d at 1325–26.

**CONCLUSION**

For the reasons above, the Court **DENIES** the Defendant's Opposed Motion to Dismiss the Indictment Due to Pre-Indictment Delay and Post-Indictment Delay. **Doc. 53.**

**IT IS SO ORDERED.**

____/s/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE