IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

     Plaintiff,

         vs.                           Case No. 1:21-cr-00997- KWR

MICHAEL ANTHONY MONTOYA,

     Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Defendant's Opposed Motion to Suppress Statements and DNA Evidence (**Doc. 55**). The Court previously held an evidentiary hearing on this matter on February 1, 2024, and the parties completed briefing their written closing arguments on March 26, 2024. **Docs. 104; 111; 112.** After reviewing the parties' briefings, the evidence developed at the hearing, and the relevant law, the Court finds that the Defendant's motion is not well taken, and therefore, is **DENIED**.

## FACTUAL BACKGROUND

In 2019, Defendant Michael Anthony Montoya was on probation for several New Mexico state convictions for trafficking of controlled substances and firearm possession. **Docs. 15 at 16; 53 at 20.** On December 30, 2019, probation officers conducted a routine field visit to the Defendant's residence at a Motel 6 in Albuquerque. **Doc. 55 at 2.** During a walk-through of the room, the probation officers found a silver machete, scales, clear plastic bags, suboxone, and two firearms under a mattress and arrested Mr. Montoya for violating the terms of his state probation agreement. *Id.* **at 2-3.** Michael Hallberg, a New Mexico state supervisory probation officer and a member of the FBI Violent Crimes Task Force, arrived at the scene and took possession of the two firearms found under Mr. Montoya's mattress: a Norinco 1911A1 pistol and a Walther P22 pistol. *See* **docs. 2 at 2;**

**55 at 19; 60 at 2.** Officer Hallberg transferred the two confiscated firearms to Federal Bureau of Investigation (FBI) Special Agent Jordan Spaeth four days later, on January 3, 2020. **Doc. 53 at 18.** Agent Spaeth opened a federal investigation into Mr. Montoya and called the United States Attorney's Office to discuss whether the case was accepted for immediate federal prosecution. **Doc. 110 at 21-22.** The U.S. Attorney's Office advised Agent Spaeth that it would need either a statement from Mr. Montoya admitting to possessing the firearms or a positive DNA match. *Id.* **at 22.** Agent Spaeth understood that to mean that he would need to collect a DNA sample from Mr. Montoya for the investigation to continue. *Id.* **at 22-23.**

On January 10, 2020, Agent Spaeth and Officer Hallberg interviewed Mr. Montoya at the Bernalillo County Metropolitan Detention Center ("MDC"). **Doc. 55 at 2.** Precisely who set up the interview is unclear; Agent Spaeth testified that he "just intended to get a consent DNA swab from Mr. Montoya" and it was "Officer Hallberg's idea to interview [the defendant]." **Doc. 110 at 24, 168-69** (Officer Hallberg stated that while he did not remember who set up the interview, it was typical for the FBI agent to take the lead). While the tenor and the circumstances of the interview are contested, the parties agree that (1) Mr. Montoya signed an FBI Advice of Rights Form, which both informed him of his protections under *Miranda* and indicated his consent to speak with Officer Hallberg and Agent Spaeth without a lawyer; (2) Agent Spaeth collected a DNA swab from Mr. Montoya; and (3) the interview was not recorded. ***See generally* docs. 55, 60, 71, 111, 112.**

Mr. Montoya was brought to the offices of the Security Threat Intelligence Unit ("STIU"), an internal intelligence group in the MDC focused on prison gangs. **Doc. 110 at 23, 143.** Three days earlier, Mr. Montoya had been found with heroin, suboxone, and cocaine in his cell at the MDC.[1] **Docs. 55 at 25-26; 110 at 79.** As a result, Mr. Montoya was taken to "seg," where he had no access

---

[1] This incident was the basis of an additional criminal complaint, filed on January 21, 2020, charging Mr. Montoya with possession of a controlled substance with intent to distribute and tampering with evidence. **Doc. 55 at 25.**

to controlled substances. **Doc. 110 at 80.** By the morning of the interview, Mr. Montoya was going through "horrible withdrawals," "hadn't eaten in, like, a day and a half, two days," and was suffering from nausea, body aches, and delirium due to a lack of sleep and dehydration. ***Id*. at 81.** Mr. Montoya was, at the time of the interview, represented by counsel in his state probation violation case by the Law Offices of the Public Defender. **Doc. 55 at 28.**

When he arrived at the STIU office, the Defendant saw three STIU officers in the room, along with Officer Hallberg and Agent Spaeth. **Doc. 110 at 82.** Immediately, Mr. Montoya felt intimidated by the STIU officers and Agent Spaeth because he did not "have the best rapport with STG officers as it is," and he had "never talked to an FBI agent before or even seen an FBI agent in person." ***Id*. at 83.** The interview started with Agent Spaeth "being really nice" to Mr. Montoya and asking him, "Hey, are you okay? How are they treating you in here? How are you doing?" Mr. Montoya did not respond. ***Id.***

After introducing themselves, Agent Spaeth asked for a DNA swab. ***Id*. at 84-85.** Mr. Montoya testified that he asked, "Do you have a warrant? Because if you don't have a warrant, then, yes, it will be a problem." ***Id*. at 85.** Agent Spaeth responded, "No, I don't have a warrant… if you make my job harder for me, then I can make it harder for you." ***Id.*** Agent Spaeth does not remember Mr. Montoya asking about a warrant; he instead describes the interaction as straightforward: "I asked him if I could swab him, told him my name, and he let me swab him." ***Id*. at 30, 56.** Agent Spaeth also testified that he believed that it would be easy and quick for him to obtain a warrant to collect Mr. Montoya's DNA. ***Id.*** Ultimately, Mr. Montoya allowed Agent Spaeth to collect a DNA sample. ***Id*. at 85.**

Next, Officer Hallberg asked if Mr. Montoya was familiar with *Miranda* warnings. ***Id.*** After Mr. Montoya indicated that he was, Officer Hallberg read the *Miranda* warnings on the FBI Advice of Rights form aloud. ***Id.*** Then, Mr. Montoya testified that Agent Spaeth asked Mr. Montoya to sign

the form, "saying that we took your DNA and you understood your Miranda rights." *Id.* **at 85.**
Agent Spaeth testified that he got verbal consent to get the DNA swab separate from the written
*Miranda* waiver. *Id.* **at 57-58, 74.** After signing the FBI Advice of Rights form, Mr. Montoya
testified that he asked Agent Spaeth, "Well, do I need a lawyer?" to which Agent Spaeth responded,
"No, we're just talking." *Id.* **at 87.** Agent Spaeth did not remember Defendant making any specific
references to lawyers but testified that his typical response to that question was, "That's up to you."
*Id.* **at 35.**

Agent Spaeth then started questioning Mr. Montoya about his knowledge of individuals
who may be trafficking large amounts of controlled substances. *Id.* **at 88.** Office Hallberg
responded, "You might want to help yourself out…You're in a lot of trouble…You just got caught
with drugs in the State…You're dealing with that and now you're dealing with us**." *Id.* **at 88-89.**
After Officer Hallberg told him he was in trouble, Mr. Montoya said, "Well, maybe I do need a
lawyer." *Id.* **at 89.** Agent Spaeth responded, "Well, yeah, that's up to you. You can get a lawyer,
but we're just talking. This conversation isn't even being recorded." *Id.* Officer Hallberg, picking
up a phone as if to call a lawyer, added, "Yeah, we can get you a lawyer if you want." *Id.* **at 89-90.**
Mr. Montoya, suspicious that the person on the phone was not a lawyer, asked to lie down until he
got a lawyer because he was "kicking."[2] *Id.* **at 90.**

The interview proceeded, and Mr. Montoya told Agent Spaeth and Officer Hallberg that "(1)
he knew he was a felon, having gone to prison for drug trafficking and aggravated battery, (2) both
pistols found under his mattress were his, further explaining how he obtained them." **Docs. 60 at 2-
3; 110 at 28-29.** In particular, Mr. Montoya told the investigators that the firearms came from an
individual named Weezy, who also lived at the motel where Mr. Montoya resided. **Doc. 110 at 90-**

---

[2] Kicking refers to the symptoms that individuals withdrawing from heroin experience. ***See* doc. 110 at 71-72.** Mr.
Montoya explained that he experiences nausea, sweatiness, delusions, and dehydration when he is kicking heroin. *Id.* **at
81.**

**92.** After hearing this explanation, Agent Spaeth cautioned the Defendant that he could help him, but only if he was honest. ***Id.* at 92-93.** Mr. Montoya understood that to mean Agent Spaeth wanted him to admit that the guns were his, which he later testified was untrue. ***Id.* at 93.**

While neither Officer Hallberg nor Agent Spaeth recorded the interview, they documented the interview in the following ways: (1) Agent Spaeth's brief report drafted on February 10, 2020, documenting that the interview took place and referencing Officer Hallberg's report for a more detailed report of the interview (2) Agent Spaeth's report drafted on June 21, 2021, more than fifteen months after the interview took place; (3) Agent Spaeth's handwritten notes taken contemporaneously during the interview; and (4) Officer Hallberg's undated report which was not written on any official form or letterhead. **Docs. 52 at 8; 72 at 2, 8-11; 110 at 64.**

The federal government later indicted Mr. Montoya for possessing firearms in violation of 18 U.S.C. §§ 922(g)(1) and (g)(3). **Doc. 2.** Mr. Montoya now seeks to suppress his statements to Officer Hallberg and Agent Spaeth and the DNA evidence collected during the interview at the MDC. ***See generally* docs. 55, 71, 112.**

## DISCUSSION

Mr. Montoya argues that his DNA sample and interview statements were collected in violation of his Fourth, Fifth, and Sixth Amendment rights. ***See generally* docs. 55, 71, 112.** He requests that this Court suppress this evidence at trial. ***See id.***

The Court finds that Mr. Montoya's Sixth Amendment right to counsel was not violated by Officer Hallberg and Agent Spaeth's interrogation of him outside the presence of his state probation violation counsel. *See United States v. Mullins*, 613 F.3d 1273, 1286 (10th Cir. 2010); *United States v. Warrington*, 78 F.4th 1158, 1165-66 (10th Cir. 2023); *United States v. Barrett*, 496 F.3d 1079, 1118 (10th Cir. 2007). Additionally, the Court finds that Mr. Montoya knowingly, intelligently, and voluntarily waived his *Miranda* rights by signing the FBI Advice of Rights form at the beginning of

the interview; he also did not invoke his right to counsel during the interview. *See Miranda*, 384 U.S. at 444; *Moran v. Burbine*, 475 U.S. 412, 421 (10th Cir. 1986); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Finally, the Court finds that Mr. Montoya consented to the DNA swab; even if he did not, the United States would have inevitably obtained the DNA through legal means. *See Maryland v. King*, 569 U.S. 435, 446 (2013); *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005). Therefore, the Court declines to suppress Mr. Montoya's interview statements, the DNA evidence, or the FBI Laboratory Report.

As an initial matter, this Court is responsible for determining the credibility of the witness testimony elicited at the February 1, 2024, hearing from Agent Spaeth, Mr. Montoya, Rick Abetya, and Officer Hallberg. *See United States v. Chatman*, 994 F.2d 1510, 1514 (10th Cir. 1993); *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997) ("Judging the credibility of witnesses, determining the weight to be afforded the testimony, and drawing reasonable inferences and conclusions from the testimony, are within the province of the district court."). Mr. Montoya questions the credibility of Agent Spaeth and Officer Hallberg, claiming that their testimony about the circumstances of the interview was contradictory and that they could not remember key details from the interview. **Doc. 112 at 2-5; Def. Exhs. ES-G; ES-I; ES-J.**

After reviewing the hearing transcript and the other evidence presented in this case, the Court finds that Officer Hallberg and Agent Spaeth's accounts of the interview are largely consistent. ***See generally* doc. 110**; *Chatman*, 994 F.2d at 1514. Where they diverge, the Court finds Agent Spaeth's testimony credible, given his more detailed recollection of the nearly four-year-old interview and his role as the main government investigator. *See id.* Officer Hallberg's lack of memory is not surprising given the short duration of the interview, his resignation from the FBI Task Force a few months after the interview, and the length of time between his resignation and testifying about the interview. ***See* doc. 110 at 160-68; 112 at 2-6**. The Court considers all these factors—as well as Officer Hallberg's

resignation from the New Mexico Corrections Department after he was issued a "Notice of Contemplated Action—Dismissal, for misconduct, specifically unprofessionalism, willful negligence, and untruthful communication and dishonest behavior"—when determining that Officer Hallberg's testimony has less weight than Agent Spaeth's. *See* **doc. 110 at 175-76**; **Def. Exh. ES-N**; *Villa-Chaparro*, 115 F.3d at 801.

## I. Mr. Montoya's Sixth Amendment Right to Counsel was not violated.

Mr. Montoya argues that his Sixth Amendment right to counsel had already attached before the interview at the MDC because he was already represented by counsel in the state proceedings against him. **Docs. 55 at 4-5; 70 at 1-3; 112 at 6-10.** Mr. Montoya argues that Agent Spaeth and Officer Hallberg's choice to interview him about the same underlying conduct that made up the basis of his state charges without counsel present was a deliberate attempt to circumvent his right to counsel. *See* **doc. 55 at 5.** Mr. Montoya requests that this Court suppress his statements during the interview because of this constitutional violation. *Id.* For the reasons below, the Court finds no Sixth Amendment violation and declines to suppress Mr. Montoya's statements.

### A. Legal Standard

The Sixth Amendment states, "in all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In other words, the Sixth Amendment forbids the government from eliciting statements from a criminal defendant outside the presence of counsel. *United States v. Mullins*, 613 F.3d 1273, 1286 (10th Cir. 2010); *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The Sixth Amendment right to counsel attaches once a prosecution commences or when "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction." *Rothgery v. Gillespie Cty.*, 554 U.S. 191, 198, 213 (2008).

The Sixth Amendment right is "offense specific;" government agents are therefore free to seek uncounseled statements from a criminal defendant about *uncharged* offenses. *Mullins*, 613 F.3d at 1286 (emphasis in original). However, the government agents cannot seek statements from a defendant about "offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Texas v. Cobb*, 532 U.S. 162, 164, 173 (2001); *Mullin*, 613 F.3d at 1287. The *Blockburger* test requires a court to determine whether each charge in the original indictment and each count of conviction "requires proof of a fact which the other does not." *United States v. Blockburger*, 284 U.S. 299, 304 (1932).

Apart from the narrow *Blockburger* exception, there is no Sixth Amendment right to counsel for uncharged offenses, even if they are closely related to or inextricably intertwined with the charged offenses. *Mullins*, 613 F.3d at 1286; *Cobb*, 532 U.S. at 186 (Breyer, J., dissenting). When a defendant faces state and federal charges for the same underlying conduct, the defendant's Sixth Amendment right to counsel attaches only after being federally arraigned, even if the defendant is already represented by counsel for the state charges. *United States v. Warrington*, 78 F.4th 1158, 1165-66 (10th Cir. 2023); *United States v. Trammell*, 133 F.3d 1343, 1349 (10th Cir. 1998); *United States v. Lanza*, 260 U.S. 377, 382 (1922).

"The dual sovereignty doctrine provides that federal and state offenses covering the same conduct are not the same offense," and most circuits have held that the dual sovereignty doctrine applies in the Sixth Amendment right to counsel context even when the underlying facts and charges are similar.[3] *Warrington*, 78 F.4th at 1165; *Trammell*, 133 F.3d at 1349; *Heath v. Alabama*,

---

[3] The majority of circuits, including the Tenth Circuit, have held that the dual sovereignty doctrine extends to the constitutional right to counsel, meaning that even if state and federal charges are predicated on the same underlying conduct, the offenses are different, and the right to counsel attaches at different times. *See Warrington*, 78 F.4th at 1165 (collecting cases). A minority of circuits have found that the dual sovereignty doctrine does not apply in the context of the Sixth Amendment right to counsel. *See, e.g., United States v. Mills*, 412 F.3d 325, 330 (2d Cir. 2005) ("Where, as here, the same conduct support a federal or state prosecutions, a dual sovereignty exception would permit one sovereign to question a defendant whose right to counsel had attached, to do so in the absence of counsel and then to share the

474 U.S. 82, 88 (1985). There is one exception to the dual sovereignty rule: if one sovereign acts "as a tool" of another subsequent prosecution such it is just a "sham and a cover" for a previously unsuccessful prosecution by the other sovereign. *Trammel*, 133 F.3d at 1349; *Bartkus v. Illinois*, 359 U.S. 121 (1959). Such a prosecution would violate the principles of double jeopardy. *See id.*

When a defendant claims that federal and state governments are acting as proxies and not as independent dual sovereigns, the defendant has the substantial burden to prove that the one sovereign is so dominated by the actions of the other that the former is not acting on its own volition. *United States v. Raymer*, 941 F.2d 1031, 1037 (10th Cir. 1991); *Bartkus*, 359 U.S. at 121 (finding no "sham" prosecution existed where a federal prosecutor extensively guided a successive state prosecution). To overcome the presumption that prosecuting sovereigns are acting distinctly, a defendant must present something beyond ordinary cooperation or evidence of sovereigns acting in concert. *United States v. Barrett*, 496 F.3d 1079, 1118 (10th Cir. 2007).

### B. Mr. Montoya's Sixth Amendment right to counsel had not yet attached on his interview date.

Mr. Montoya argues that his Sixth Amendment right to counsel had already attached during the interview with Officer Hallberg and Agent Spaeth because his state and federal proceedings were based on the same conduct, and he was already represented by counsel in the state proceedings. **Doc. 55 at 7-9.** The United States argues that Mr. Montoya was not charged with any federal crime at the time of the interview and, therefore, his Sixth Amendment right to counsel did not apply to any questioning about uncharged federal offenses. **Doc. 62 at 3.**

Mr. Montoya's Sixth Amendment right to counsel attached on July 15, 2021, the date of his indictment and when federal prosecution against him commenced. ***See*** **doc. 2**; *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *Rothgery*, 554 U.S. at 198, 213. The federal and state charges Mr.

---

information with the other sovereign without fear of suppression."); *United States v. Worjloh*, 546 F.3d 104 (2d Cir. 2008).

Montoya faced for the same underlying conduct are different offenses; the fact that counsel already represented Mr. Montoya for his state probation violation has no bearing on whether Mr. Montoya's Sixth Amendment right to counsel was implicated. *Mullins*, 613 F.3d at 1286; *Warrington*, 78 F.4th at 1165. Therefore, before Mr. Montoya's indictment in 2021, Officer Hallberg and Agent Spaeth were free to seek uncounseled statements from Mr. Montoya on his uncharged federal offenses without violating his Sixth Amendment right to counsel. *See Mullins*, 613 F.3d at 1286; *Moulton*, 474 U.S. at 176.

The Sixth Amendment bars federal agents from seeking statements from Mr. Montoya about offenses that, even if not formally charged, would be considered the same under the *Blockburger* test; under *Blockburger*, Mr. Montoya's state and federal charges are different if each requires proof of a fact which the other does not. *See Cobb*, 532 U.S. at 164, 173; *Blockburger*, 284 U.S. at 304. At the time that the Defendant was being questioned about his possession of the firearms by the FBI, he was also facing numerous state probation violations, which have different elements from the federal felon-in-possession statute. **Doc. 53 at 19.** Therefore, Mr. Montoya's Sixth Amendment right to counsel was not triggered under the narrow *Blockburger* exception.[4] *Mullins*, 613 F.3d at 1286; *Cobb*, 532 U.S. at 186.

---

[4] The record is unclear as to the precise state charges Mr. Montoya was facing in state court as a result of his probation violations on January 10, 2020. **See doc. 55 at 17-24.** According to the New Mexico Corrections Department Parole and Probation Division's Report of Violation, Mr. Montoya was "taken into custody on a probation violation and is pending new charges of Possession of a Firearm or Destructive Device by a Felon." **See doc. 71-1 at 3.** However, Mr. Montoya was ultimately not charged under the New Mexico statute prohibiting felons from possessing firearms; instead, Mr. Montoya was charged with two counts of possession of a controlled substance, trafficking controlled substances, and tampering with evidence. **Docs. 15 at 17-18; 71-3.**

Even if Mr. Montoya was facing state charges for being a felon in possession of a firearm, the New Mexico statute defines a felon as a person "convicted of a felony offense" and that "less than ten years have passed since the person completed serving a sentence or period of probation for the felony conviction, whichever is later." NM Stat. § 30-7-16. This time limitation does not exist in the federal statute. *See* 18 U.S.C. § 922(g)(1). Conversely, the federal statute requires a firearm to affect interstate commerce, which is not an element of the New Mexico statute. *Id.*; NM Stat. § 30-7-16. Therefore, the potential state charges relating to the possession of the firearms are distinct from the then-uncharged federal charges for possessing the firearms under *Blockburger*.

**C. Mr. Montoya's Sixth Amendment right to counsel was not circumvented by Officer Hallberg's dual role as a state supervisory probation officer and FBI Task Force Officer.**

Mr. Montoya argues that Officer Hallberg's dual role as a state probation officer and a member of the FBI Violent Crimes Task Force means he acted as a state proxy for the federal investigation, thus circumventing Mr. Montoya's right to counsel. **Doc. 112 at 6.** *See Moulton*, 474 U.S. 170-71. The Defendant claims that the search of his residence was "seemingly at the behest of an FBI taskforce operation" and that Officer Hallberg, acting in his role as an FBI task force officer, later brought the case to Agent Spaeth. **Docs. 112 at 6; 55 at 7-8; 110 at 19.**

The dual sovereignty doctrine applies in the right-to-counsel context, meaning that "prosecutions undertaken by separate sovereign governments, no matter how similar they may be in character, do not raise the specter of double jeopardy as that constitutional doctrine is commonly understood." *Warrington*, 78 F.4th at 1165; *Trammel*, 133 F.3d at 1349. Therefore, Mr. Montoya's prosecution by the state of New Mexico and the federal government—separate sovereign governments—does not immediately raise a double jeopardy issue regarding the right to counsel. *See Trammell*, 133 F.3d at 1349; *Heath v. Alabama*, 474 U.S. 82, 88 (1985). The dual sovereignty rule is only violated if one sovereign acts "as a tool" of another and subsequent prosecution is just a "sham and a cover" for a previously unsuccessful prosecution by the other sovereign. *Trammel*, 133 F.3d at 1349; *Bartkus v. Illinois*, 359 U.S. 121 (1959). However, if New Mexico and the federal government are working distinctly, evidence of law enforcement officials from those sovereigns acting in concert is irrelevant and does not override the dual sovereignty doctrine. *See Barrett*, 496 F.3d at 1118.

As evidence that Office Hallberg, a state official, acted as a federal proxy in this case, the Defendant points to (1) Officer Hallberg's dual role as both a state probation supervisory agent that collected the firearms recovered Mr. Montoya's residence and an FBI Task Force Officer; and (2)

11

the inconsistent way that Officer Hallberg identified himself as an FBI Task Force Officer thorough the investigation. **Docs. 55 at 7-8; 70 at 2; 112 at 6-7** ("Consequently the case was a mere handoff from one sovereign to another; Hallberg's state probation officer status was a subterfuge for his task force officer role; and it was a federal investigation Spaeth claimed he did not open until January 3, 2020…").

Testimony at the evidentiary hearing established that Officer Hallberg and Agent Spaeth worked together on the FBI Violent Crimes Task Force in 2020; the purpose of the task force was to work with local and state agencies to get real-time information about individuals who could be prosecuted for federal crimes. **Doc. 110 at 17-18**. Officer Hallberg's role, as a non-full-time member of the Task Force, was to "review corrections department interactions with subjects and find subjects that met the federal prosecution guidelines and present it to the agents who would then present it to the U.S. Attorney's Office." *Id.* **at 18-20.** Officer Hallberg understood his role as a task force officer as an "additional duty" to his full-time role as a state probation officer that allowed him the "ability to file federal charges." ***See id.* at 156-57, Def. Exh. ES-H.** Based on this understanding of his role, there was no clear distinction between Officer Hallberg's role as a state probation officer and federal task force officer when performing FBI Task Force work, such as identifying Mr. Montoya as a potential subject that met federal prosecution guidelines. **Doc. 110 at 169-170** (when asked if he was acting in his capacity as a state probation officer or federal task force officer or both when he went to the MDC, Officer Hallberg testified, "Whenever I was working those types of things, it was both."). However, this evidence of cooperation between the state of New Mexico does not mean that Officer Hallberg was an improper federal proxy. *See Barrett*, 496 F.3d at 1118.

Mr. Montoya has also not shown that the actions of the state of New Mexico were so dominated by the actions of the federal government that New Mexico was not acting of its own

volition. *See Raymer*, 941 F.2d at 1037. Outside of the Defendant's conclusory statement, there is no convincing evidence to suggest that state probation officers searched Mr. Montoya's residence at the request of the United States. ***See* docs. 110 at 18; 112 at 6**. Rather, the record suggests that the probation officers only contacted Officer Hallberg for assistance after they found two firearms under Mr. Montoya's mattress during a field visit.[5] **Docs. 71-1 at 3; 110 at 155.** Agent Spaeth also unequivocally testified that the FBI did not direct the initial search of Mr. Montoya's residence and that he first learned about the case when Officer Hallberg brought the search at Mr. Montoya's residence to Agent Spaeth as potentially interesting for federal prosecution. **Doc. 110 at 18.**

Agent Spaeth was unaware of the developments in New Mexico's case against Mr. Montoya, including Mr. Montoya's drug possession charges and his plea deal, and did not share Mr. Montoya's interview statements with anyone working on Mr. Montoya's state case. ***Id.* at 40-41.** There is no evidence that Agent Spaeth directed the New Mexico state investigation into Mr. Montoya, which concluded within months of his arrest. **Def. Exh. PD-H.** Finally, a sealed federal case number in the background of an evidentiary photo hardly proves that Officer Hallberg used the state probation visit as a subterfuge to secure evidence for a federal case, especially given Officer Hallberg's role as a federal task force officer. ***See* docs. 112 at 8; 110 at 153;** *Raymer*, 941 F.2d at 1037.

From the start, the state and federal investigations into Mr. Montoya had different focuses. ***See* doc. 71-1**. When Agent Spaeth opened the FBI case file into Mr. Montoya, he spoke with the United States Attorney's Office to confirm what evidence was required to bring a federal case against him for possessing firearms. ***See* doc. 110 at 22-23.** The federal investigation included the

---

[5] Officer Hallberg testified that his role as a task force officer was "to supervise certain high-value probation and paroleees, and if we – like, if the – another probation officer came across someone with a firearm, they would call me to go over there and take possession of the firearm, and get, like, federal charges filed for felon in possession of a firearm." **Doc. 110 at 155.**

collection of Mr. Montoya's DNA and sending the firearms to the FBI Laboratory for DNA testing. *See* **doc. 110 at 37-38.** These investigatory components were separate and apart from the state charges, which ultimately focused on Mr. Montoya's possession and trafficking of controlled substances. *See* **doc. 71-3;** *Raymer*, 941 F.2d at 1038. While Mr. Montoya was briefly asked about information about his state case—possession of controlled substances while in the MDC, the basis of new state charges[6]—most of the interview focused on building a federal case against Mr. Montoya for possessing firearms and gathering intelligence about drug trafficking activities in the area. *See* **doc. 110 at 50-51; def. exh. ES-C.** Further, there is no evidence that Officer Hallberg participated in investigating or prosecuting Mr. Montoya's state case apart from collecting the firearms from his residence and transferring them to the FBI. *See* **doc. 71-2.** Therefore, Officer Hallberg's role as a state probation officer can best be characterized as ordinary cooperation with federal authorities rather than evidence that the United States dominated New Mexico's investigation of Mr. Montoya. *See Raymer*, 941 F.2d at 1037; *Bartkus*, 359 U.S. at 121; *Barrett*, 496 F.3d at 1118.

Finally, the procedural and investigatory anomalies cited by Defendant also do not show that Officer Hallberg was acting as an improper federal proxy. *See* **docs. 55 at 6-8; 70 at 1-3;** *Raymer*, 941 F.2d at 1037. For the reasons described above, the Court finds Agent Spaeth's testimony that Officer Hallberg was the lead investigator at the beginning of the case credible and that his main reason for attending the interview was to procure a DNA swab from Mr. Montoya. *See* **doc. 110 at 23-24;** *Chatman*, 994 F.2d at 1514; *Villa-Chaparro*, 115 F.3d at 801. Considering this, Officer Hallberg's negligence in completing the proper paperwork for the firearms, failure to record the

---

[6] The criminal complaint for the Mr. Montoya's possession of controlled substances with the intent to distribute within the MDC were not filed until January 21, 2020, eleven days after Agent Spaeth and Officer Hallberg interviewed him in the MDC. *See* **def. exh. ES-C.** There is no indication in the record that Officer Hallberg participated in investigating that offense, or that he provided information to the prosecutor in Mr. Montoya's state case. *See id.*

interview, or request a DNA sample more likely indicates careless investigative work rather than evidence that Officer Hallberg was acting as an improper federal proxy. *See* **doc. 112 at 6-9**. Once Agent Spaeth took over the case in July 2020, the record is clear that he corrected these anomalies as quickly as possible within the context of a global pandemic**.** *See* **doc. 110 at 24-28.**

While there is certainly evidence that the federal prosecution of Mr. Montoya was initially the result of state and federal cooperation through the FBI Violent Crimes Task Force, such collaboration does not override the dual sovereignty doctrine. *See id. at 18-20; Barrett*, 469 F.3d at 1118-19. It is beyond dispute that the state of New Mexico and the federal government are separate sovereigns. *See id.* As such, evidence of ordinary cooperation between the sovereigns is irrelevant to discussions of whether the dual sovereignty doctrine was violated in Mr. Montoya's case. *See id.* Contrary to the Defendant's assertions, the record reflects that Officer Hallberg—acting as a probation officer and task force officer—recognized that Mr. Montoya's possession of firearms was federally interesting and presented the case to Agent Spaeth. *See* **doc. 110 at 154-55.** Before or after the interview, there is no indication that either Officer Hallberg or Agent Spaeth directed the state's prosecution, that Officer Hallberg was a "tool" of the federal government, or that the federal prosecution of Mr. Montoya for possessing the firearms was a "sham prosecution" meant to gain information outside of the presence of counsel. *See Barrett*, 496 F.3d at 1018; *Heath*, 474 U.S. at 88; *Trammel*, 133 F.3d at 1349; *Bartkus*, 359 U.S. at 121. The Court concludes that Mr. Montoya's Sixth Amendment right to counsel was not violated by Officer Hallberg's role as a state probation officer and, therefore, declines to suppress his interview statements. *See id.*

## II.    **Mr. Montoya knowingly, intelligently, and voluntarily waived his Miranda rights and did not invoke his right to counsel during the interview.**

Mr. Montoya also argues that this Court must suppress his interview statements because his Fifth Amendment rights were violated: (1) his *Miranda* waiver was not made knowingly or voluntarily; (2) Officer Hallberg and Agent Spaeth psychologically coerced the *Miranda* waiver, and

(3) Officer Hallberg and Agent Spaeth ignored his requests for counsel and did not halt the interrogation. ***See generally*** **docs. 55, 71, 112.** For the reasons below, the Court disagrees.

### A. Legal Standard

The Fifth Amendment states that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To be admissible, "a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *United States v. Young*, 964 F.3d 938, 942 (10th Cir. 2020) (quoting *Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993)). Without the warnings described in *Miranda v. Arizona*, custodial confessions are presumed to be the product of coercion and are generally inadmissible at trial. 384 U.S. 436, 467 (1966); *United States v. Guillen*, 995 F.3d 1095, 1108-09 (10th Cir. 2021).

A suspect may waive their *Miranda* rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. The government bears the burden of proving, by a preponderance of the evidence, that the waiver of *Miranda* rights was voluntary. *See Young*, 964 F.3d at 943; *United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006). Voluntariness is determined under a totality of circumstances based on the characteristics of the accused and the interrogation, and no single factor is determinative. *Id.*; *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002). To show that a suspect voluntarily waived their *Miranda* rights, the government must show that (1) the waiver was a product of free and deliberate choice rather than intimidation, coercion, or deception and (2) the defendant made the waiver in full awareness of the rights waived and the consequences of waiving that right. *Moran v. Burbine*, 475 U.S. 412, 421 (10th Cir. 1986). Coercive police activity is a "necessary predicate" to find that a confession is involuntary under the Fifth Amendment, regardless of the defendant's mental condition. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *United States v. Guerro*, 983 F.2d 1001, 1003-04 (10th Cir. 1993).

Therefore, the ultimate inquiry into voluntariness is whether the officers took unfair advantage of the defendant's traits or the surrounding circumstances. *United States v. Lamy*, 521 F.3d 1257, 1261-62 (10th Cir. 2008); *Guerro*, 983 F.2d at 1004. While no single factor is determinative, relevant factors to the voluntariness inquiry may include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." *Lamy*, 521 F.3d at 1262 (quoting *Toles*, 297 F.3d at 966). *See also United States v. Chalan*, 812 F.2d at 1302, 1307 (10th Cir. 1987).

The fact that a defendant is under the influence of drugs or alcohol is not enough to render his *Miranda* waiver involuntary. *See Coddington v. Sharp*, 959 F.3d 947, 959 (10th Cir. 2020); *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008). A defendant's drug or alcohol use "will render a confession involuntary only if the suspect's will was overborne by the circumstances surrounding the giving of a confession." *Coddington*, 959 F.3d at 959 (quoting *United States v. Smith*, 606 F.3d 1270, 1276–77 (10th Cir. 2010)). When determining whether withdrawal symptoms affected the voluntariness of a statement, trial courts look at whether the law enforcement officers knew of the withdrawal symptoms, whether the defendant verbalized their discomfort and the outward physical and mental manifestations of withdrawal symptoms*. See, e.g., United States v. Quinones-Gonzales*, 452 F.2d 964, 966 (10th Cir. 1971) (finding the defendant's statements made during heroin withdrawal were voluntary because of agent testimony that the defendant appeared alert and engaged); *United States v. Morris*, 287 F.3d 985, 898 (10th Cir. 2002) (holding that a hospitalized defendant on pain medication still knowingly and intelligently waived his *Miranda* rights because he was "alert and responsive during the interview.")

To analyze voluntariness, therefore, a court must first determine if the police conduct is coercive. *See Connelly*, 479 U.S. at 167. If the court finds that the government's conduct is

coercive, the next step is to analyze whether the government took advantage of the defendant's characteristics. *Lopez*, 437 F.3d at 1064. Finally, a trial court must determine if the valid *Miranda* waiver was made knowingly and intelligently, meaning that the waiver was made "in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Toro-Palaez*, 107 F.3d 819, 825 (10th Cir. 1997).

Even if a suspect decides to speak with investigators after receiving *Miranda* warnings, all questioning must stop once a suspect has unambiguously requested counsel during an interview. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Davis v. United States*, 512 U.S. 452, 459 (1994); *United States v. Santistevan*, 701 F.3d 1289, 1292 (10th Cir. 2010). An unambiguous request requires a subject to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Edwards*, 451 U.S. at 459; *Davis*, 512 U.S. at 462) (finding that the defendant's remark "Maybe I should talk to a lawyer" was not a request for counsel). If a *Miranda* waiver is voluntary, officers may question a suspect until the suspect makes an unequivocal request for an attorney; if the suspect merely references an attorney or makes an ambiguous request for an attorney, an officer is not required to stop questioning that suspect. *Davis v. United States*, 512 U.S. 452, 459 (1994); *Santistevan*, 701 F.3d at 1292.

If the trial court determines that the *Miranda* waiver was not voluntary or that a defendant's unambiguous request for counsel was ignored, the usual remedy is suppressing the involuntary statements. *Oregon v. Estad*, 470 U.S. 298, 304-07 (1985); *Edwards*, 451 U.S. at 459. Evidence is a "fruit of the poisonous tree" if it was discovered as a direct result of a law enforcement officer's unlawful activity, and there is a "factual nexus between the illegality and the challenged evidence." *United States v. Olivares-Rangel*, 458 F.3d 1104, 1108-09 (10th Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)). However, the fruit of the poisonous tree doctrine is

limited when applied to *Miranda* violations. *United States v. Pettigrew*, 468 F.3d 626, 634–35;

*Elstad*, 470 U.S. at 307 ("Unlike evidence obtained through a Fourth Amendment violation,

however, the Miranda presumption does not require that the "fruits [of unlawfully obtained

confessions] be discarded as inherently tainted."). Therefore, a *Miranda* violation warrants the

exclusion of statements but not physical evidence. *United States v. Patane*, 542 U.S. 630, 641–42,

(2004) (Generally, "[t]he exclusion of unwarned statements ... is a complete and sufficient remedy

for any perceived Miranda violation."). *See also New York v. Harris*, 495 U.S. 14, 18-19 (1990).

**B. Mr. Montoya's Miranda waiver was voluntary, knowing, and intelligent.**

As an initial matter, Mr. Montoya argues that this Court's analysis of voluntariness is

handicapped by the agents' failure to record an interrogation, thereby violating established

Department of Justice policies mandating that interrogators record interviews with individuals in

federal custody. ***See* docs. 53 at 7-8; 70 at 5-6**; *Justice Manual*, Department of Justice, § 9.13-001

(2014 amendment). Mr. Montoya further argues that the investigators' decision not to record the

interview shows bad faith, violating the Defendant's due process rights. **Doc. 53 at 5.**

However, the United States did not show bad faith by not recording the interview; the

Department of Justice Policy only applies to subjects in federal custody during their interrogation.

***See* doc. 55 at 8, n.6**; Justice Manual, Department of Justice, § 9.13-001 (2014 amendment). During

his interview at the MDC, Mr. Montoya was in state, not federal, custody. **Doc. 62 at 6.** While it

may be best practice to record all interrogations, the investigators' failure to do so—by itself—does

not constitute bad faith. *See United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) ("The inquiry

into allegations of prosecutorial bad faith presents a mixed question of law and fact in which the

quintessential factual of intent predominates.") (internal citations and quotations omitted); *United

States v. Richard*, 969 F.2d 849, 853-854 (10th Cir. 1992) ("The mere fact that the government

controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith.").

Even if the interview was "potentially useful" to Mr. Montoya's defense, the decision to document the interview through a written report does not rise to the same level of destroying evidence or failing to preserve evidence already in existence. *See id; Arizona v. Youngblood*, 488 U.S. at 51, 58 (1988). Finally, violations of internal agency policies meant to protect constitutional rights—like the Justice Department's policy on recording interrogations—do not result in the suppression of evidence. *See Justice Manual*, Department of Justice, § 9.13-001 (2014 amendment); *United States v. Koerber*, 10 F.4th 1083, 1104 (10th Cir. 2021).

The Defendant also argues that without recording the interview, the Government cannot meet its burden that Mr. Montoya's waiver was voluntary because the witness accounts of the interview are inconsistent. **Doc. 70 at 6.** *See United States v. Bundy*, 966 F. Supp. 2d 1180, 1187-88 (D.N.M. Aug. 26, 2013) (finding the government's failure to record the interview meant that the government could not carry its burden to prove voluntariness, given the defendant's emotional state, her injuries, the fact that she was on several medications). While this Court does not have a recording of the interview, it does have three extensive accounts of the interview from Officer Hallberg, Agent Spaeth, and Mr. Montoya. ***See generally* doc. 110.** Given their testimony, the Court can confidently assess whether Mr. Montoya's *Miranda* waiver was voluntary. ***Id. See Villa-Chaparro***, 115 F.3d at 801.

Mr. Montoya does not contest that he waived his *Miranda* rights when he signed the FBI's Advice of Rights Form at the beginning of his interview with Agent Spaeth and Officer Hallberg. **Doc. 62-1.** Rather, Mr. Montoya argues that the MDC interview was coercive, rendering his waiver involuntary because (i) the setting of the interview in the STIU office, (ii) Agent Spaeth's claim that he could make life difficult for Mr. Montoya if he did not cooperate, (iii) Mr. Montoya's heroin withdrawal symptoms, (iv) Agent Spaeth's misrepresentation of the interview as "just talking," and (v) Agent Spaeth's decision not to record the interview. **Docs. 55 at 12-13; 70 at 5-6.** He further

argues that his lack of knowledge of the federal investigations was psychologically coercive and made the contested law enforcement activity "particularly suspect." **Docs. 55 at 11; 112 at 17-19.** In response, the United States argues that Mr. Montoya voluntarily waived his *Miranda* rights when he signed the FBI's Advice of Rights form. **Doc. 62-1.** The Government also denies that Agent Spaeth made any threatening statements to Mr. Montoya or that Agent Spaeth was aware of Mr. Montoya's withdrawal symptoms. **Doc. 62 at 7-9.**

This Court must first examine Officer Hallberg's and Agent Spaeth's conduct to determine whether their actions were coercive. *See Young*, 964 F.3d at 943; *Connelly*, 479 U.S. at 167. Mr. Montoya claims that the interview location—the STIU office—with three STIU officers present was intimidating. ***See* doc. 112 at 15.** While the interview location was initially police-dominated, the STIU office was a typical office space with six desks, computers, and art on the walls—far less threatening than if the interview had occurred in an interrogation room. ***See* doc. 110 at 23-24**; *United States v. Revel*, 510 F.3d 1269, 1275 (10th Cir. 2007). While the Defendant did not "have the best rapport with [STIU officers]," their brief presence was not coercive; after Mr. Montoya communicated his discomfort, Agent Spaeth asked the STIU officers to leave the room. **Doc. 110 at 90.** Moreover, while Mr. Montoya testified that he was intimidated by meeting an FBI agent for the first time, he described Agent Spaeth as "nice" throughout the interview. *Id.* **at 83, 111.**

Mr. Montoya argues that the statements "were obtained by the use of subtle psychological persuasion" and were "involuntary, psychologically coerced statements." **Doc. 112 at 17.** The Court disagrees. After Mr. Montoya gave his statement, Agent Spaeth focused primarily on gathering information that may prevent other violent crimes. **Doc. 110 at 28.** Notably, Agent Spaeth and Officer Hallberg did not make any specific promises of leniency to the Defendant or exaggerate the evidence that the United States had against him. *See United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994). While Agent Spaeth made statements that he could help Mr. Montoya if he were honest,

this type of statement is, at most, a limited assurance of leniency, a permissible interrogation tactic that is not coercive. *See* **doc. 110 at 61, 92**; *Lewis,* 24 F.3d at 82; *United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006). Additionally, the government investigators took no other types of actions that could be considered coercive: the interview was brief and pleasant in tone, Mr. Montoya was not deprived of food or sleep,[7] and he was not physically abused during the interview. *See* **doc. 110 at 34-35, 106-08, 122**; *Lopez*, 437 F.3d at 1064-65; *Sharp v. Rohling*, 793 F.3d 1216, 1233; *Young*, 964 F.3d at 945.

Finally, based on the testimony of Mr. Montoya and Agent Spaeth, the Court finds that Agent Spaeth did not make threatening statements by physical or psychological coercion such that Mr. Montoya's will was overborne. *See Guillen*, 995 F.3d at 1123. Specifically, the Defendant claims Agent Spaeth told him that "he could make life difficult for me," which Agent Spaeth denies. **Doc. 110 at 61.** (Agent Spaeth testifying, "Number one, that is not something I would ever say to somebody, and, number two, I don't know how I could make [Mr. Montoya's] life more miserable for him."). The Court finds Agent Spaeth's testimony here credible, given the overall tenor of the interview and Mr. Montoya's testimony that Agent Spaeth was nice but increasingly skeptical of Mr. Montoya's explanations for where the firearms came from. *See id.* **at 110-11**; *Villa-Chaparro*, 115 F.3d at 801.

Moreover, even if Agent Spaeth did make that statement, the Supreme Court has only outlawed such techniques that "subjugate the individual to the will of his examiner." *Rhode Island v. Innis*, 446 U.S. 291, 299 (1979). Mr. Montoya has not demonstrated that this one statement subjugated his will to Agent Spaeth, especially given the written and oral *Miranda* warnings he received. *See id.* Mr. Montoya also testified that he perceived Agent Spaeth's alleged threat to mean

---

[7] Mr. Montoya testified that he was sleep-deprived due to his withdrawal symptoms, not because of any actions by the government investigators or the conditions of his confinement. *See* **doc. 100 at 81-82.**

that he was going to "build a case to send [Mr. Montoya] to prison," and not that Agent Spaeth would be physically violent towards him. **Doc. 110 at 107-08.** A single statement during a relatively friendly interview, even if it did occur, clearly did not overwhelm the Defendant's will; the Defendant simply understood that Agent Spaeth was acting as an FBI agent and investigator on the case. *See id.*; *Innis*, 446 U.S. at 299; *Guillen*, 995 F.3d at 1123.

Next, this Court examines whether Officer Hallberg and Agent Spaeth took unfair advantage of Mr. Montoya's characteristics or the surrounding circumstances. *See Lamy*, 521 F.3d at 1261-62. By a preponderance of the evidence, the statements made by Mr. Montoya were voluntary. *Young*, 964 F.3d at 943. Mr. Montoya is an adult man; his detention and interview were not prolonged, and he was advised of his rights both orally and in writing at the beginning of the interview. **Docs. 62-1; 110 at 85-86.** *See Lamy*, 521 F.3d at 1262; *Toles*, 297 F.3d at 966. Mr. Montoya argues that his intimidation and lack of previous federal contact made his waiver involuntary. **Docs. 55 at 11; 70 at 3-4; 112 at 15.** Mr. Montoya has a lengthy criminal history, including several periods of incarceration in the New Mexico Corrections Department. *See* **doc. 55 at 11; 111 at 11.** While Mr. Montoya felt intimidated by his first interaction with an FBI agent, that is not enough to meet a threshold determination of coercion. *See* **doc. 110 at 80-83**; *Young*, 964 F.3d at 944-45 (finding that a defendant's lack of federal experience was just one factor—combined with the FBI agent's promises of leniency, misrepresentations about the penalties the defendant faced, and false assertions that the agent had spoken with a judge—in determining that the FBI agent's actions were coercive).

Mr. Montoya's assertions that he was "nervous and sick from heroin withdrawal"— experiencing symptoms of sleep deprivation, dehydration, and delusions—also do not render his

*Miranda* waiver involuntary.[8] ***See* docs. 112 at 18; 110 at 81.** While Mr. Montoya says that the evidence of his symptoms should have been evident to the casual observer, it is likely that his stated symptoms did not manifest themselves externally. ***See* doc. 110 at 54, 81;** *Quinones-Gonzales*, 452 F.2d at 966**.** Mr. Montoya only notified the agents one time that he was "kicking" but otherwise kept his symptoms to himself even after Agent Spaeth asked him how he was doing. **Doc. 110 at 31, 90**. Both Officer Hallberg and Agent Spaeth testified that they did not observe Mr. Montoya exhibiting symptoms of withdrawal, and that he was alert and engaged during the interview, providing clear answers to their questions. *Id.* at 29-30, 172 (Agent Spaeth stating, "I was under the impression that [Mr. Montoya] understood what I was doing there… he didn't seem like he was on the side of it where he wouldn't be understanding anything…He seemed to understand everything.") (Officer Hallberg stated, "I worked in drug treatment for two years, and it did not appear that [Mr. Montoya] was going through withdrawals."). *See Smith*, 606 F.3d at 1277; *Morris*, 287 F.3d at 989.

This account is corroborated by Mr. Montoya's own recollection of the interview; while he testified that he sometimes experienced severe confusion or "delusion" during withdrawals, he was able to remember the interview in specific detail four years after it occurred, suggesting that he was both alert and engaged during the conversation. **Doc. 110 at 31, 104** (Agent Spaeth testifying, "Even if someone is going through withdrawals, that doesn't mean that they wouldn't be able to understand what's going on. It would be like if you were sick, you could still answer questions and think."). Mr. Montoya's testimony established that he was not confused during the interview, understood Agent Spaeth's questions, and easily remembered detailed and precise information

---

[8] Neither party contends that Mr. Montoya was under the influence of drugs or alcohol at the time of the interview. **Doc. 110 at 29; 80** (Agent Spaeth testifying that Mr. Montoya did not exhibit any signs of current heroin use like "nodding out" during the interview, and Mr. Montoya testifying that he had no access to controlled substances once he was taken to "seg" three days prior). Even if Mr. Montoya was under the influence of drugs, his waiver would only be involuntary if his will was overborne by the circumstances around giving a confession, which no party has argued. *See Coddington*, 959 F.3d at 959; *Burson*, 531 F.3d at 1258.

about how the firearms came into his possession. *See id.* **at 111.** For all these reasons, Mr.

Montoya's withdrawal symptoms do not render his *Miranda* waiver involuntary. *See Quinones-*

*Gonzales*, 452 F.2d at 966; *Morris*, 287 F.3d at 989.

Mr. Montoya also argues that the waiver of his *Miranda* rights was not knowing and

intelligent. ***See doc. 55 at 13;112 at 17***; *Moran*, 475 U.S. at 421. A trial court must determine if the

waiver was made in full awareness of the nature of the rights being waived and the consequences of

waiving them. *See Toro-Palaez*, 107 F.3d at 825-26. First, Mr. Montoya's extensive criminal

history and testimony established he had previously heard and understood Miranda warnings. **Docs.**

**17; 110 at 85**. Officer Hallberg read the FBI Advice of Rights form aloud to Mr. Montoya and

provided Mr. Montoya with a written version to peruse. **Docs. 62-1; 110 at 85-86.** Mr. Montoya

signed the FBI Advice of Rights Form, indicating that he was apprised of, understood, and waived

his rights. ***See doc. 62-1***; *Smith*, 606 F.3d at 1277. Finally, after Mr. Montoya signed the form,

Agent Spaeth asked him one last time, "You don't want – you're good? You want to speak with

us?" and Mr. Montoya continued to speak with agents. **Doc. 110 at 87.**

Mr. Montoya argues that Agent Spaeth's statements that they were "just talking" directly

contradicted the *Miranda* warnings he had just received; however, given the number of times and

various methods that Mr. Montoya was apprised of his rights, the Court finds that Agent Spaeth's

description of the interview as "just talking" was not so deceptive as to go to "directly to the nature

of the suspect's rights and the consequences of waiving them." **Docs. 55 at 8-9, 13; 70 at 4-5; 110**

**at 86-89;** *United States v. Farley*, 607 F.3d 1294, 1328-1330 (11th Cir. 2010). Based on all these

factors, Mr. Montoya—despite his withdrawal symptoms, the presence of intimidating STIU

officers, and his inexperience with a physical *Miranda* waiver—freely and deliberately waived his

Miranda rights, with a complete understanding of the consequences. *See Toro-Palaez*, 107 F.3d at

826.

Mr. Montoya's *Miranda* waiver was valid because it was made knowingly, intelligently, and voluntarily. Therefore, this Court declines to suppress the statements made in the interview or the DNA test results on these grounds. *See Patane*, 542 U.S. at 641–42; *United States v. Lara-Garcia*, 478 F.3d 1231, 1235 (10th Cir. 2007).

**C. Mr. Montoya did not invoke his right to counsel during the interview.**

Mr. Montoya argues that his Fifth Amendment right to counsel was violated because he requested an attorney twice during the interview. **Doc. 55 at 4-5.** Because questioning should have ceased immediately after those requests, Mr. Montoya contends that his statements should be suppressed. **Doc. 112 at 10.** In response, the United States argues that Mr. Montoya's statements were not unambiguous requests for an attorney, so Agent Spaeth and Officer Hallberg were not required to stop the interview. **Doc. 62 at 7-8.** Based on the following, the Court agrees.

Mr. Montoya first claims that he requested a lawyer at the beginning of the interview when he asked Officer Hallberg and Agent Spaeth if he "needed a lawyer" after waiving his *Miranda* rights. **Docs. 55 at 4; 110 at 89.** Even though the Court heard differing testimony as to Agent Spaeth's response to that question, the Court finds that Mr. Montoya's question was not an unambiguous request for an attorney such that a reasonable police officer would understand it as a request for an attorney. *See Davis*, 512 U.S. at 459. Rather, Mr. Montoya's statement solicited an opinion from his interrogators about whether an attorney was required in this situation. *See Santistevan*, 701 F.3d at 1292-93; *United States v. Yazzie*, 188 F.3d 1178, 1193 (10th Cir. 1999); *United States v. Ogbuehi*, 18 F.3d 807, 813 (9th Cir. 1994).

Mr. Montoya claims that he made a second unequivocal request for an attorney after Officer Hallberg reminded him that he was "in a lot of trouble" because he was facing both state and federal charges. **Docs. 112 at 11; 110 at 88-89.** In response, Mr. Montoya testified that he said "Well, maybe I do need a lawyer." **Doc. 110 at 89.** This statement was also not an unambiguous request for

26

an attorney. *See Davis*, 512 U.S. at 462 (finding that a defendant's statement to law enforcement agents that "maybe I should talk to a lawyer" was not a clear and unequivocal request for an attorney). During cross-examination, the Defendant testified that even though he said, "Maybe I do need a lawyer," he meant, "I wanted a lawyer." **Doc. 110 at 109-110.** Whatever Mr. Montoya meant by his statement, a reasonable police officer would not understand his statement as a clear assertion of the right to counsel. *See Davis*, 512 U.S. at 459; *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984). Mr. Montoya's subsequent actions—declining to take the phone offered to him by Officer Hallberg to call an attorney—also indicate that he was not unambiguously requesting counsel. **Doc. 110 at 89-90.** Because Mr. Montoya's two requests for counsel were ambiguous and equivocal, the Court declines to suppress his subsequent statements.

### D. Montoya's confession should not be suppressed under Fed. R. Crim. P. 5(e) or 18 U.S.C. § 3501(c).

Mr. Montoya argues that his interview statements should be suppressed because the United States violated Federal Rule of Criminal Procedure 5(e) and 18 U.S.C. § 3501(c). Federal law requires that the United States present an arrestee promptly to a federal magistrate judge; the government's failure to do so may result in the exclusion of a confession made between the arrest and appearance in front of a federal magistrate. *Corley v. United States*, 556 U.S. 303 (2009); 18 U.S.C. § 3501(c); *Smith*, 606 F.3d at 1278; Fed. R. Crim. P. 5(e) (a defendant must be taken before a federal magistrate "without unnecessary delay."). However, the presentment rule does not take effect until a suspect is arrested for a federal offense. *Smith*, 606 F.3d at 1278 ("Where a person is under arrest on solely non-federal charges, the prompt-presentment rule … is [not] relevant even when the arresting officers believe the person may have also violated federal law or the person makes an inculpatory statement to federal agents."); *See also United States v. Alvarez*, 511 U.S. 350, 358 (1994).

Mr. Montoya made his incriminating interview statements while he was arrested for violating his state probation agreement and had not yet been charged with any federal crime. ***See docs. 55 at 4; 17 at 17-18***. The contested inculpatory statements occurred years before he was federally arrested on July 15, 2021, and appeared before a federal magistrate on July 22, 2022. ***See docs. 7, 16;*** *Smith*, 606 F.3d at 1278. Mr. Montoya made no contested statements to government investigators between his federal arrest and arraignment; therefore, the prompt presentment rule under Fed. R. Crim. P. 5(e) or 18 U.S.C. § 3501(c) is not implicated. *Smith*, 606 F.3d at 1278. The Court declines to suppress Mr. Montoya's interview statements on statutory grounds.

### III.   Mr. Montoya's DNA was not collected in violation of the Fourth Amendment.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Using a buccal swab on a person's inner cheek to obtain a DNA sample is a search under the Fourth Amendment. *Maryland v. King*, 569 U.S. 435, 446 (2013). Consent or a warrant can make a search reasonable, but a warrantless search is presumptively unreasonable under the Fourth Amendment. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Voluntary consent to a search requires (1) law enforcement officials to receive either express or implied consent and (2) that consent must be freely and voluntarily given. *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012); *Florida v. Rayer*, 460 U.S. 491, 497 (1983). A district court must decide whether consent to search is voluntary by a totality of the circumstances, considering factors like physical mistreatment, use of violence, threats, promises, inducements, trickery, deception, aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers present, and the display of police weapons. *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006). If a search is unreasonable, the exclusionary rule bars the introduction of evidence at trial that was obtained in violation of the Fourth Amendment. *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009).

The inevitable discovery doctrine is an exception to the exclusionary rule and permits evidence to be admitted at trial if an independent, lawful police investigation would have inevitably discovered it. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (citation omitted); *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). The United States bears the burden of proving the evidence would have inevitably been discovered without a Fourth Amendment violation. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014). When applying the inevitable discovery doctrine to a warrantless search, the Tenth Circuit uses a four-factor test: 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause. *Cunningham*, 413 F.3d at 1203-04.

Mr. Montoya argues that the warrantless seizure of his DNA was obtained through "coercion" and "without voluntary consent," in violation of the Fourth Amendment prohibition on unreasonable seizures; Mr. Montoya argues that there was no written consent to the DNA swab and that Agent Spaeth threatened him into providing the DNA. ***See* docs. 55 at 14; 70 at 6**; U.S. Const. amend. IV. He, therefore, requests that the DNA swab and FBI laboratory report be suppressed under the exclusionary rule. ***See* doc. 55 at 14-15.** In response, the United States argues (1) that Mr. Montoya consented to the search and (2) that even if he did not voluntarily consent to the search, the United States would have inevitably gotten the DNA through legal means. **Doc. 62 at 9.**

First, Mr. Montoya argues that he was coerced into providing the DNA sample, rendering his consent involuntary. **Docs. 55 at 14; 70 at 6-7.** As discussed earlier, Agent Spaeth asked Mr. Montoya for his DNA, and Mr. Montoya responded by asking, "Well, do you have a warrant? Because if you don't have a warrant, then, yeah, it might be a problem." **Doc. 110 at 106.** Agent

Spaeth responded, "Well, no, I don't have a warrant, but if you -- I mean, if you go that route and you make my job harder, then I can make it difficult." *Id.* Because of Agent Spaeth's statement that he could make life difficult for Mr. Montoya, Mr. Montoya claims that his consent was not freely and voluntarily given. *See Jones*, 701 F.3d at 1317. However, as Mr. Montoya explained during his cross-examination, he understood Agent Spaeth to mean he would "build a case to send [Mr. Montoya] to prison." **Doc. 110 at 107-08.**

Such a statement, therefore, does not render the subject's consent to a DNA swab involuntary such that it must be suppressed. *Rayer*, 460 U.S. at 497; *McCane*, 573 F.3d 1042; *Jones*, 701 F.3d at 1317. The other circumstances of the interview also suggest that Mr. Montoya voluntarily gave his consent to a DNA swab: the tone of the interview was friendly, there was no display of police weapons, the Defendant appeared to be aware and engaged during the interview, there were no threats of physical violence, and the officers did not engage in trickery or deception during the interview. ***See* doc. 110 at 25-31, 79-85, 101-105**; *Sawyer,* 442 F. 3d at 895. The fact that Agent Spaeth did not get a separate consent form for the DNA swab is also not indicative that Mr. Montoya's consent to the DNA swab was defective. ***See* doc. 110 at 58**; *Rayer*, 460 U.S. at 497; *McCane*, 573 F.3d 1042.

Second, the Court agrees that even if Mr. Montoya's consent to collect his DNA was not voluntary, the inevitable discovery doctrine applies to this search. ***See* docs. 55 at 14; 62 at 8-9; 70 at 6-7;** *King*, 569 U.S. at 446; *Cunningham*, 413 F.3d at 1203. Applying the Tenth Circuit's four-factor test, the Court concludes that a lawful police investigation would have independently collected the DNA: (1) the record does not reflect that Agent Spaeth or Officer Hallberg ever started the process to get a warrant for Mr. Montoya's DNA; (2) there was strong probable cause for the collection of Mr. Montoya's DNA given his felony status and the firearms found in his residence; (3) a warrant was not ultimately obtained after DNA swab was collected; and (4) there is no

evidence that Agent Spaeth "jumped the gun" because he lacked confidence in their showing of probable cause. *See* **doc. 110 at 28-35** (Agent Spaeth testifying, "I could easily get a search warrant. I could write that search warrant in ten minutes, and it wouldn't be a problem. He's in custody. He's not going anywhere. At that time it wouldn't have been hard."); *Cunningham*, 413 F.3d at 1203; *Torres-Castro*, 470 F.3d at 999.

Given that Agent Spaeth had strong probable cause to collect Mr. Montoya's DNA, Mr. Montoya was in custody at the time of the swab, the presence of the firearms in Mr. Montoya's residence, and Agent Spaeth's high confidence in his ability to obtain a search warrant for Mr. Montoya's DNA if necessary, the Court declines to exclude the DNA buccal swab or the FBI Laboratory report from trial. *See* **docs. 62 at 8*; *71-1 at 3; 110 at 30**; *Cunningham*, 413 F.3d at 1203; *Torres-Castro*, 470 F.3d 992, 999; *McCane*, 573 F.3d 1042.

## CONCLUSION

For the reasons above, the Defendant's Opposed Motion to Suppress Statements and DNA Evidence (**Doc. 55**) is **DENIED**.


**IT IS SO ORDERED.**


_/s/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE