**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

          vs.                           Case No. 1:21-cr-0997-KWR

MICHAEL ANTHONY MONTOYA,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on the Defendant's Motion to Dismiss the Indictment (**Doc. 51**). The Court ordered supplemental briefing on December 19, 2023, which the parties completed on January 16, 2024. **Docs. 83; 91, 99.** After reviewing the briefings and the relevant law, the Court finds that the motion is not well-taken and, therefore, is **DENIED.**

## BACKGROUND

In 2016, Defendant Michael Anthony Montoya plead guilty in New Mexico state court to several felonies including trafficking a controlled substance, aggravated battery with a deadly weapon, possession of a controlled substance, possession of a firearm by a felon, and receiving or transferring a stolen motor vehicle. **Doc. 91 at 11.** After serving a period of incarceration for these offenses, he was put on probation in 2019. ***See id;* doc. 15.**

On December 30, 2019, probation officers made a routine visit to Mr. Montoya's residence and found suboxone,[1] a machete, two handguns, and a box of ammunition. **Doc. 61 at**

---

[1] The Defendant allegedly admitted that the suboxone was his but said that he had a prescription for it. ***See* doc. 91 at 11-12.** Suboxone is the trade name of buprenorphine, a narcotic opioid analgesic, which is controlled in Schedule III of the Controlled Substances Act. DRUG ENFORCEMENT ADMINISTRATION—DRUG AND CHEMICAL

**1.** Mr. Montoya was subsequently indicted for being a prohibited person in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924. **Docs. 2; 91 at 11-12.** The indictment alleges that Mr. Montoya was previously convicted of at least one crime punishable by imprisonment for a term exceeding one year and knew he was addicted to a controlled substance when he possessed a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and (g)(3). *Id.* Mr. Montoya firmly disputes these factual allegations but agrees to stipulate— only for this motion—that he was an unlawful user of suboxone. **Doc. 99 at 2.**

Mr. Montoya now moves to dismiss the indictment, arguing that 18 U.S.C. §§ 922(g)(1) and 922(g)(3) are facially unconstitutional under the Second Amendment and *New York Rifle & Pistol Ass'n, Inc. vs. Bruen*. **Doc. 51 at 2;** 597 U.S. 1 (2022); 18 U.S.C. §§ 922(g)(1) and (g)(3). Mr. Montoya also argues that these laws are unconstitutional as applied to the facts of his case. **Docs. 51 at 1; 99 at 9-10.**

## LEGAL STANDARD

The Second Amendment protects the "right of the people to keep and bear Arms." Const. amend. II. While the Second Amendment protects the fundamental right to individual self-defense, it is not an unlimited "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("The Court's opinion should not be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.").

---

EVALUATION SECTION, *Buprenorphine Information Sheet* (May 2022)
[https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf] (last visited on March 13, 2023).

In *Bruen*, the Supreme Court clarified the test that district courts must apply when deciding whether the government unconstitutionally infringed on an individual's Second Amendment right to bear arms. *Bruen*, 597 U.S. at 26 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understandings."); *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023). A trial court must first determine whether the Second Amendment's plain text covers an individual's conduct. *Bruen*, 597 U.S. at 24 (reiterating that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"); *Vincent*, 80 F.4th at 1199. If it does, the government must justify its regulation by demonstrating that the infringement on the individual's right to bear arms is consistent with the nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 24.

A court must, therefore, determine if the modern firearm regulation is "relevantly similar" to an established historical tradition of firearm regulation. *Id.* at 28-29. To do so, *Bruen* first directs courts to assess whether the Founders specifically anticipated this type of historical regulation. *Id.* at 28. If the modern regulation deals with a new societal issue or dramatic technological change, courts may utilize a more nuanced approach to determine if historical analogues exist to "circumstances beyond those the Founders specifically anticipated." *Id.* An analogue exists where the historical regulation imposes (i) a comparable burden on the right to self-defense as the contested regulation and (ii) a similar justification for that burden. *Id.* at 29 (describing the two metrics that "render regulations relevantly similar under the Second Amendment" are the "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *Heller*, 554 U.S. at 599.

Under this standard, a modern firearm regulation can be found unconstitutional when (1) a challenged regulation addresses a general societal problem that existed in the eighteenth century, but no historical regulation addressed the problem; (2) earlier generations addressed a societal problem in a materially different way; or (3) an earlier generation tried to enact a similar regulation that was rejected as being unconstitutional. *Bruen*, 597 U.S. at 26-27. This approach recognizes that firearms today pose different regulatory challenges from those that preoccupied legislators when the Second Amendment was ratified in 1791 or when the right to self-defense was extended to the states by the Fourteenth Amendment in 1868. *Id.* at 34 ("We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal."); *Heller*, 554 U.S. at 634-635 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them."). Therefore, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." 597 U.S. at 30 (emphasis in original) (noting that analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check). The government's historical analogues must also be sufficiently established to demonstrate tradition. *Id.* at 46 ("For starters, we doubt that three colonial regulations could suffice to show a tradition of public-carry regulations.")

The Supreme Court's decision in *Bruen* has produced a legion of constitutional challenges to the federal statutes prohibiting the possession of firearms. *See, e.g.,* **doc. 61 at 3-4 n.1;** *United States v. Bullock,* 2023 WL 4322309 (S.D. Miss. June 28, 2023) (noting that there have been "dozens" of district court cases challenging the constitutionality of 922(g)(1)); *United States v. Harrison*, 654 F.Supp.3d 1191, 1196 (W.D. Okla. Feb. 3, 2023).

A party may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both. *United States v. Carel*, 669 F.3d 1211, 1217 (10th Cir. 2011). An as-applied challenge acknowledges that a regulation may be generally constitutional but argues that the law is unconstitutional as applied to the specific circumstances of the parties. *Carel*, 668 F.3d at 1217; *N.M Youth Org. v. Herrera*, 611 F.3d 669, 677 n.5 (10th Cir. 2010). A facial challenge, by contrast, is a "head-on attack of a legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Carel*, 668 F.3d 1217. To bring a successful facial challenge, a challenger must establish no circumstances under which a statute would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). "Facial challenges are disfavored [because] a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotations and citations omitted).

## DISCUSSION

Mr. Montoya argues that in the wake of *Bruen*, federal laws banning prohibited persons from possessing firearms—like sections 922(g)(1) and (3)—are facially unconstitutional and as applied to the facts of his case. **Doc. 51 at 5**. Section 922 (g)(1) makes it unlawful for any person convicted in any court of a crime punishable by imprisonment for a term exceeding one year to possess any firearm or ammunition. 18 U.S.C. § 922(g)(1). Section 922(g)(3) similarly prohibits any person who is an unlawful user of or addicted to any controlled substance from possessing firearms or ammunition. 18 U.S.C. § 922(g)(3). For the following reasons, the Court finds that §§ 922(g)(1) and (g)(3) are facially constitutional and constitutional as applied to Mr. Montoya's circumstances.

I.      **18 U.S.C. § 922(g)(1) is constitutional under Tenth Circuit caselaw.**

Mr. Montoya argues that this Court should set aside the Tenth Circuit's decision in *Vincent v. Garland* upholding the constitutionality of § 922(g)(1) after *Bruen*. ***See* docs. 51 at 3-4; 74 at 4-5;** 80 F.4th at 1202 (upholding the constitutionality of the federal ban on possessing firearms for both violent and nonviolent convicted felons). Mr. Montoya contends that § 922(g)(1) is unconstitutional because (i) other courts around the country have found that § 922(g)(1) is unconstitutional after *Bruen*; (ii) the Tenth Circuit did not apply the *Bruen* test when deciding that § 922(g)(1) was constitutional in *Vincent;* and (iii) this Court should not apply *Vincent* while it is being appealed. ***See* doc. 51 at 4; 74 at 4-5.** For the reasons below, this Court disagrees.

Despite the Defendant's arguments about how other courts have decided § 922(g)(1), *Vincent* clearly states that § 922(g)(1) remains constitutional after *Bruen*. *See* 80 F.4th at 1202. Even while *Vincent* is being appealed, this Court is obligated to apply the precedent of the Tenth Circuit. *United States v. Spedalieri*, 910 F.2d 707, 709 n.2 (10th Cir. 1990). Before *Bruen*, the leading Tenth Circuit case on the constitutionality of federal felon-in-possession bans was *United States v. McCane,* which "squarely upheld the constitutionality of the ban on felons' possession of firearms." 573 F.3d 1037, 1047 (10th Cir. 2009); *Vincent*, 80 F.4th at 1202. In *Vincent*, the Tenth Circuit analyzed *Bruen* to decide if it had "indisputably and pellucidly abrogated *McCane*" and found that it did not. *Vincent*, 80 F.4th at 1200. Therefore, this Court is bound by circuit precedent, which clearly states that § 922(g)(1) is constitutional.[2] *See id.*; *McCane;* 573 F.3d at

---

[2] Because *Vincent* so clearly states that § 922(g)(1) is facially constitutional after *Bruen*, this Court declines to assess the historical analogues presented by the Government. ***See* doc. 61 at 2-7;** 80 F.4th at 1200-02. While *Vincent* did not thoroughly analyze § 922(g)(1) under *Bruen's* new test, it noted several bases to conclude that § 922(g)(1) was still constitutional. *See generally Vincent*, 80 F.4th 1197. First, the *Vincent* court noted that the *Bruen* test drew heavily upon the analysis in *Heller*, which stated that "nothing in its opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" and that "felon dispossession statutes are presumptively lawful." *Id.* (quoting *Heller*, 554 U.S. at 626, 627 at n.27). Second, through the concurrences and

1047; *Spedalieri*, 910 F.2d at 709 n.2. In his briefings, Defendant makes no specific arguments about why § 922(g)(1) is unconstitutional as applied to the specific facts of his felony status or his alleged possession of the firearms. ***See generally* docs. 51; 74.** Therefore, this Court also finds that section § 922(g)(1) is constitutional as applied to the Defendant. *See Carel*, 668 F.3d at 1217; *N.M Youth Org.,* 611 F.3d at 677 n.5.

## II.    18 U.S.C. § 922(g)(3) is facially constitutional after *Bruen.*

Because the Tenth Circuit has not ruled on the constitutionality of § 922(g)(3) after *Bruen*, this Court must ascertain whether § 922(g)(3)'s prohibition on the possession of firearms by unlawful users of controlled substances is within this nation's tradition of firearm regulation. *See Vincent*, 80 F.4th at 1200-02; *Bruen*, 597 U.S. at 28-29; 18 U.S.C. § 922(g)(3). Mr. Montoya also argues that the Government has not demonstrated that laws prohibiting unlawful users of prescription medications—in his case, the unlawful use of the prescription opioid suboxone—is within this nation's tradition of firearm regulation, rendering 922(g)(3) unconstitutional as applied to the facts of his case. ***See* doc. 99 at 9**; 18 U.S.C. § 922(g)(3); *Bruen*, 597 U.S. at 17; *Carel*, 668 F.3d at 1217; *Salerno*, 481 U.S. at 745.

### A.  The plain text of the Second Amendment protects Mr. Montoya's conduct.

*Bruen's* first step requires this Court to determine whether the Second Amendment's plain text protects Mr. Montoya's possession of firearms for self-defense. *See* 597 U.S. at 24; *Vincent*, 80 F.4th at 1200. The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." Const. amend. II. Mr. Montoya argues that his alleged

---

dissents of at least six justices, *Bruen* also supports federal prohibitions on felons possessing firearms. *See, e.g., id*. at 2157. The *Bruen* opinion also signals support for "shall-issue" licensing regimes for firearms, in which states conduct criminal background checks to ensure that an applicant is a "law-abiding responsible citizen." *Id.* at 2123-24, 2138 n.9, 2156. Based on *Bruen's* preservation of shall-issue licensing regimes and related background checks, the Tenth Circuit reasoned that the Supreme Court "arguably implied that it was constitutional to deny firearm licenses to individuals with felony convictions." *Vincent*, 80 F.4th at 1202.

possession of the firearms is "presumptively protected conduct" covered by "the plain text of the Second Amendment." **Doc. 51 at 5;** *Bruen*, 597 U.S. at 17. In response, the Government argues that the Second Amendment protects the rights of "ordinary, law-abiding citizens" to keep and bear arms; drug users that unlawfully use controlled substances under § 922(g)(3) are, by definition, not "law-abiding citizens" and are therefore outside the scope of Second Amendment. ***See*** **doc. 61 at 6-7** (arguing that *Bruen* limits Second Amendment rights to "law-abiding citizens" on fourteen occasions); *Bruen*, 597 U.S. at 8, 31-32.

While the Constitution does not define "the people," the phrase appears multiple times throughout the Bill of Rights. Const. amend I ("…the right of the people to peaceably assemble…"); IV ("the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); IX ("the enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people"). *Heller* defined the scope of the term "the people" broadly as "all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580; *United States v. Verdugo-Urquidez*, 494 U.S. 259, 256 (1990) (describing "the people" as a term of art that refers to "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.").

As *Heller* directs, any analysis of the constitutionality of modern firearm regulations begins "with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580. This strong presumption and the broad inclusivity of the term "the people" indicates that the plain text of the Second Amendment presumptively protects the rights of people—including the subset of the population that habitually uses controlled substances—to possess firearms for individual self-defense. *See id.*;

*Bruen*, 597 U.S. at 24. There is no textual indication that the population that encompasses "the people" is defined differently in the Second Amendment than it is described elsewhere in the Constitution; for example, habitual drug users do not forfeit their First, Fourth, and Ninth Amendment rights simply due to their illicit drug use. *See, e.g.*, Const. amends. I, IV, IX, X; *Heller*, 554 U.S. at 580; *Verdugo-Urquidez*, 494 U.S. at 256. Finally, "while *Bruen* clearly establishes that being a law-abiding citizen is sufficient to be included in "the people" to whom the Second Amendment right is endowed, any indication that being a law-abiding citizen is necessary to be included in "the people" is dicta." *United States v. Espinoza-Melgar*, 2023 WL 5279654 *3 (D. Utah. Aug. 16, 2023); *Range v. Att'y Gen.*, 69 F.4th 96, 101 (3rd Cir. 2023) (*en banc*) (explaining that the "criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So, their references to 'law-abiding, responsible citizens" were dicta.").

Here, Mr. Montoya's alleged possession of the firearms found in his residence is presumptively protected by the Constitution because the Second Amendment's plain text encompasses an individual right to possess and carry weapons for self-defense. *See Bruen*, 597 U.S. at 24; *Heller*, 554 U.S. at 592; **doc. 51 at 3**. Mr. Montoya is an American citizen, so he is part of "the people" protected by the Second Amendment. ***See* doc. 15 at 1**; *Verdugo-Urquidez*, 494 U.S. at 256; *Heller*, 554 U.S. at 580. Therefore, Mr. Montoya's suspected possession of firearms is constitutionally protected conduct—despite his admitted status as an unlawful user of prescription medication—and this Court moves to the second prong of the *Bruen* test. ***See* doc. 99 at 9**; 597 U.S. at 22-24; *United States v. Coombes*, 629 F. Supp. 3d 1149, 1154-56 (N.D. Okla., Sept. 21, 2022).

**B. The Government has demonstrated that § 922(g)(3) falls within this nation's history and tradition of disarming "dangerous" groups.**

Mr. Montoya's alleged firearm possession is presumptively protected conduct, so the Government must demonstrate that the regulation is consistent with this nation's history and tradition of firearm regulation. *See Bruen*, 597 U.S. at 26-27. The proliferation of controlled substances like suboxone was not a circumstance that the Founders specifically anticipated.[3] *See id.* at 28; **docs. 61 at 20; 99 at 2.** The United States thus presents three classes of historical regulations that, by analogy, demonstrate that § 922(g)(3) is within this nation's history and tradition of firearm regulation: (1) historical regulations that disarm the mentally ill, (2) the intoxicated, and (3) other distrusted and dangerous groups. **Docs. 61 at 18; 91 at 2-3.** In response, Mr. Montoya argues that the Government has not demonstrated a well-established and representative historical analogue for the disarmament of habitual drug users. **Doc. 74 at 5.**

To conduct its second step *Bruen* analysis, this Court first examines why § 922(g)(3) was passed and how it infringes on Second Amendment rights. *See* 597 U.S. at 26-27. Then, to determine whether § 922(g)(3) is part of this nation's historical tradition of firearm regulation, this Court must analyze whether the Government's historical analogues disarmed habitual drug users in the same ways and for the same reasons as § 922(g)(3). *See id.*

**1. 18 U.S.C. § 922(g)(3)**

---

[3] While people have recreationally used poppy plant derivatives for millennia, medical use of opioids in the United States widely began only in the mid-1850s. Morphine was first synthesized in 1806, and heroin was developed several decades later in 1874. The use of heroin for medical purposes was banned with the passage of the 1924 Anti-Heroin Act, and the FDA subsequently approved methadone and suboxone for treatment for opioid use disorder in 1972 and 2002, respectively. Sivils. A, et.al, *Suboxone: History, Controversy, and Open Questions*, 13 FRONTS. PSYCHIATRY 1, 3-4 (2022) [https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9664560/pdf/fpsyt-13-1046648.pdf] (last accessed Mar. 20, 2024). Suboxone is intended for the treatment of opioid addiction but has the potential to produce significant dose-related euphoria. When prescribed by a licensed healthcare provider, the combination of naloxone and suboxone blocks the euphoric high sought by illicit drug users. *Buprenorphine Information Sheet* (May 2022).

Before assessing the historical analogues cited by the Government, this Court must determine how 18 U.S.C. § 922(g)(3) infringes on the individual right to self-defense and Congress' justification for that infringement on the right. *Bruen*, 579 U.S. at 29. 18 U.S.C. § 922(g)(3) prohibits any person who is an unlawful user of or addicted to controlled substances from keeping or possessing a firearm. This prohibition is relatively new and was enacted after Congress passed the Gun Control Act of 1968. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 102, 82 Stat. 1213, 1220-21; *United States v. Yancey*, 621 F.3d 682, 683-84 (7th Cir. 2010). The justification for the law was primarily to protect public safety; the 1968 Gun Control Act stripped individuals of their right to possess firearms because unlawful users of controlled substances were considered a presumptively risky category of people.[4] *See id.* (describing the purpose of the Act as providing "support to Federal, State, and local law enforcement officials in their fight against crime and violence."); *Dickerson v. New Banner Inst., Inc.*, 406 U.S. 103, 112-113 n.6 (superseded by statute) ("Congress' intent in enacting 922(g) and (h) … was to keep firearms out of the hands of presumptively risky people.").

As enacted, § 922(g)(3) is a blanket prohibition on the possession of firearms by any habitual user or addict of a controlled substance. 18 U.S.C. § 922(g)(3). While the statute's text suggests permanent disarmament of habitual drug users, the Tenth Circuit has consistently imposed a temporal element to the term "user;" the statute's prohibition on possessing firearms

---

[4] The legislative history of the Gun Control Act of 1968 provides further support that Congress intended to protect public safety by keeping firearms out of the hands of presumptively risky people like habitual drug users. *Yancey*, 621 F.3d at 683-83 ("[H]abitual drug users, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly weapons."). *See also* S. Rep. No. 90-1501, at 22 (1968) ("The ready availability, that is, the ease with which any person can anonymously acquire firearms (including criminals, juveniles without the consent of their parents or guardians, narcotic addicts, mental defectives, armed groups who would supplant duly constituted public authorities, and other whose possession of firearms is similarly contrary to the public interest) is a matter of serious national concern."); 114 Cong. Rec. 21784 (1968) ("No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses, from buying, owning, or possessing firearms.").

lasts as long as the individual user's habitual use or addiction to a controlled substance. *United States v. Reed*, 114 F.3d 1067, 1071 (10th Cir. 1997) (finding that the term "user" in § 922(g)(3) has a temporal connotation); *United States v. Bennett*, 329 F.3d 769, 776-77 (10th Cir. 2003) (when applying the term "prohibited person" under the Sentencing Guidelines, the government must show that the defendant's drug use was contemporaneous, but not necessarily simultaneous, with his firearm possession); *United States v. Morales-Lopez*, 92 F.4th 936, 945 (10th Cir. 2024) (explaining that appellate courts have introduced a narrowing temporal construction to eliminate the risk that § 922(g)(3) could be vague in its application); *United States v. Edwards*, 540 F.3d 1156, 1162 (10th Cir. 2008) (stating that as-applied challenges to § 922(g)(3) will "fail where the government has introduced sufficient evidence of a temporal nexus between the drug use and firearm possession.").

Therefore, § 922(g)(3) was enacted to keep firearms out of the hands of "presumptively risky people" that could endanger public safety in the future. The Act does so by prohibiting the possession of firearms by habitual users or addicts of a controlled substance so long as they are using the controlled substance contemporaneously with the firearm possession. *See* GUN CONTROL ACT OF 1968; *Yancey*, 621 F.3d at 683-84; *Reed*, 114 F.3d at 1071; *Edwards*, 540 F.3d at 1162; *Morales-Lopez*, 92 F.4th at 945.

## 2. __The Government's historical analogues__

Next, the Court assesses the Government's historical analogues in support of its argument that 18 U.S.C. § 922(g)(3) is in line with this nation's tradition of firearm regulation: disarmament of the mentally ill, the intoxicated, and other presumptively risky groups of people. *__See generally__* docs. **61; 91.**

### A. Historical analogues that disarm the mentally ill

The United States argues that § 922(g)(3)'s prohibition on firearm possession by unlawful users of controlled substances is "analogous to longstanding prohibitions on the possession of firearms by … the mentally ill" because mental illness can "render a person incapable of safely and responsibly possessing a firearm." **Doc. 61 at 18.** As examples of these historical prohibitions, the Government points to the authority given to English and American eighteenth-century justices of the peace to lock up dangerous lunatics" to prevent them from going abroad" and to "seize their property to pay for the cost of securing them."[5] **Docs. 61 at 18; 91 at 2-3.**

While courts have previously analogized habitual drug use and mental illness, the Government has not proven that there was a widespread practice of disarming the mentally ill in the latter part of the eighteenth century. *See* Larson, *supra* note 5 at 1378 ("The strongest originalist argument for the exception for the mentally ill rests on the traditional ability of the peace to confine individuals with dangerous mental impairments. Specific eighteenth-century

---

[5] Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 LAW & SOC'Y REV. 487, 488, 514 (1985) (under England's 1744 Vagrancy Act, a dangerous lunatic acquitted of a crime due to insanity could be confined by the agreement of two justices of the peace, but the confinement under the Act was "mainly informal and irregular," with many insanity acquitees sent home or placed in the care of family instead of being confined to asylums and jails); 1788 N.Y. LAWS Ch. 12 ("AN ACT concerning ideots, lunaticks, and infant-trustees. That the *chancellor for the time being, shall have the care and provide for the safekeeping of all lunaticks, and of their lands and tenements and goods and chattels; and that they and their household, if they have any, may live and be competently maintained by and out of their goods and chattels and the profits of their lands and tenements respectively,* and that no waste or destruction of their lands or tenements be done or permitted and such lands and tenements shall in no wise be aliened, but shall, together with the issue, of the goods, chattels, and profits, if there be any, be restored to such lunatic if he comes to his right mind; and if he dies in lunacy, his lands and tenements shall descent and go to his heirs and the residue of said goods, chattels and profits shall go to and be distributed according to law, among the next kin of such lunatic.") (emphasis added); Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868) (discussing that certain classes of people are "almost universally excluded" from the "proper exercise of the elective franchise" including women, infants, slaves, "the idiot, lunatic, and the felon, on obvious grounds."); *Yancey*, 621 F.3d at 685 (quoting Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller, and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1371 (2009) ("in eighteenth-century America, justices of the peace were authorized to lock up lunatics who were dangerous to be permitted to go abroad.") (internal quotations omitted).

laws disarming the mentally ill, however, simply do not exist."). A closer look at § 922(g)(3) supports the conclusion that it is not reasonably similar to historical prohibitions on the mentally ill possessing firearms. **See doc. 61 at 18-19**; *Bruen,* 597 U.S. at 28-29.

The examples cited by the Government do not directly disarm the mentally ill; instead, they describe mechanisms to confine "dangerous" lunatics to prevent them from going abroad. **See doc. 61 at 18-19.** For example, England's Vagrancy Act of 1744 authorized the commitment of "dangerous lunatics" by the agreement of two justices of the peace. 1744 Vagrant Act §§ 4, 9. In practice, however, the commitment of criminal defendants was "informal and irregular;" the mentally ill were often released into the care of their relatives and were not barred from possessing firearms because of the threat they posed to public safety. *See Moran, supra* note 5 at 488, 514**. Unlike § 922(g)(3)—which categorically removes the Second Amendment right based on drug addicts' presumed risky behavior—English justices of the peace had to make an individualized decision about whether a specific mentally ill person was dangerous.[6] *See Bruen*, 597 U.S. at 28-29; Larson, *supra* note 5 at 1378.

The United States also relies heavily on Thomas Cooley's treatise on state constitutional law. **Docs. 61 at 19-21; 91 at 1-2**. *See, e.g.,* Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign?*, 36 OKLA. L. REV. 65, 96 (1983) ("Colonial and English societies of the eighteenth century, as well as their modern counterparts, have excluded … idiots [and] lunatics.") (citing T. COOLEY, *A Treatise on Constitutional Limitations* 57 (7th ed. 1903)). However, Cooley's treatise mentions explicitly the exclusion of the mentally ill in the

---

[6] While there is evidence that eighteenth-century Americans were aware of how English justices of the peace managed the threat to society posed by the "dangerous" mentally ill, the Government just provided one example—a 1788 New York law—allowing a judge to intrude significantly on the civil liberties of the mentally ill. *See* HENRY CARE, *English Liberties, or the Free-born Subject's Inheritance* 329 (6th ed., 1774) (A 1774 American treatise on the liberties belonging to English subjects included an example of a "warrant to secure a lunatic" for constables, churchwardens, and overseers of the poor that allowed two justices of the peace to detain individuals "by lunacy so disordered in their senses, that he is dangerous to go abroad."); 1788 N.Y. Laws Ch. 12.

context of the "elective franchise," not the Second Amendment right to bear arms. *See* COOLEY, *supra* at 57; *Harrison*, 654 F. Supp. 3d at 1207. While substantial, excluding the mentally ill from voting is not relevantly similar to § 922(g)(3)'s infringement on the right to bear arms for individual self-defense. *See id.; Bruen* 597 U.S. at 28-29. The United States also argues that the Supreme Court, in recent Second Amendment cases, has repeatedly said that their rulings do not "cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill." *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) (quoting *Heller*, 554 U.S. at 626-27) (internal quotes omitted); *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring); *id.* at 129-30 (Breyer, J., dissenting). Even so, under *Bruen*, the Government is still required to demonstrate that this nation has an established and longstanding tradition of disarming the mentally ill. *See Bruen*, 597 U.S. at 46.

The Government's remaining evidence for the supposed longstanding tradition of disarming the mentally ill comes from a single eighteenth-century New York law that allowed for the mentally ill to be confined and their possessions seized to pay for their care. ***See*** **docs. 61 at 19-21; 91 at 1-2;** 1788 N.Y. Laws Ch. 12. The Government contends that it was permissible for judges to intrude significantly on the liberties of "dangerous lunatics," which supports the lesser intrusion of disarming the mentally ill. ***See*** **doc. 91 at 2.** However, these intrusions did not authorize the confinement of every mentally ill person; like the New York law's English predecessor, it required two justices of the peace to agree that the mentally ill individual was "dangerous." *See* 1788 N.Y. Laws Ch. 12; 1744 Vagrant Act §§ 4, 9. Unlike these laws, § 922(g)(3) does not require a finding that a habitual drug user is dangerous; the statute presumes that all habitual drug users will engage in presumptively risky behavior. *See Bruen,* 597 U.S. at 28-29*; Dickerson*, 406 U.S. at 112-113 n.6; *Yancey*, 621 F.3d at 683-84; S. REP. NO. 90-1501, at

22. Moreover, while the New York law is relevant, a single historical regulation is not enough to demonstrate a tradition of disarming the mentally ill. *See Bruen*, 597 U.S. at 46.

Because the Government has cited just one eighteenth-century regulation that allowed justices of the peace to place the "dangerous" mentally ill in the care of the state, it has not carried its burden of establishing a longstanding historical tradition of disarming the mentally ill. *Bruen*, 597 U.S. at 24. Therefore, this Court cannot find that § 922(g)(3)'s disarmament of habitual drug use is analogous to a well-established historical tradition of disarming the mentally ill in this country. ***See* docs. 61 at 18-19; 91 at 2**; *Bruen,* 597 U.S. at 46**.**

### B.  Historical analogues that disarm the intoxicated

Next, the Government argues that § 922(g)(3) is "also analogous to historical laws that prohibited carrying a firearm while under the influence of alcohol," including colonial and Founding-era laws,[7] Reconstruction-era laws that prohibited intoxicated persons from possessing, using, or receiving firearms, and 1930s-era state laws that regulated the sale of weapons to drug addicts. **Doc. 61 at 19-20.** These laws are intended to demonstrate that legislators have long understood the dangers of arming individuals who were intoxicated. *See United States v. Daniels*, 77 F.4th 337, 345 (5th Cir. 2023); 1868 Kan. Gen. State., Crimes & Punishments § 282; 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws § 1; 1883 Wis. Sess. Laws 290, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 77 § 4; 1899 S.C. Acts 97, no. 67 § 1.

"Americans drank alcohol—and lot of it," and Founding-era attitudes towards drinking "equated drunkenness to a temporary fit of madness" or a "form of insanity." ***See* doc. 61 at 19**;

---

[7] The United States provides three examples, including a 1655 Virginia law prohibiting the "shoot[ing] any guns at drinkeing," a 1771 New York law banning shooting guns around New Year's to prevent the "great Damages … frequently done … by persons … intoxicated with Liquor;" and 1746 New Jersey statute that prohibited soldiers from "appear[ing] in Arms disguised in Liquor." ***See* doc. 61 at 19**; 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York; 1746 N.J. Gen. Assemb. Law, section 3.

*Daniels*, 77 F.4th at 345. *See, e.g.,* Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits on the Mind and Body*, 6 (1819) (describing that one symptom for the "odious disease" of drunkenness is "certain extravagant acts which indicate a temporary fit of madness"). "Common sense indicates that individuals who are impaired by alcohol lack the self-restraint to handle deadly weapons safely. So it is unsurprising to find historical laws dealing with guns and alcohol. Such rules are relevant to our history and tradition of gun regulation." *Daniels*, 77 F.4th at 345. Despite this historical acknowledgment of the dangers of combining alcohol and firearms, Founding-era statutes regulating guns and alcohol were both sparse and limited in scope and duration. *See, e.g.*, 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York; 1746 N.J. Gen. Assemb. Law, section 3. These few laws indicate that the Founders were aware of the potential dangers associated with mixing firearms and alcohol but chose not to regulate this activity heavily. *See Bruen,* 597 U.S. at 28. Given that constitutional rights are enshrined within the scope they were understood to have when the people adopted them, this Court weighs most heavily the historical regulations on firearm possession that existed around 1791, with lesser importance given to later regulations.[8] *See Heller*, 554 U.S. at 634-35; *Bruen*, 597 U.S. at 27-28.

In determining whether these historical laws coalesce on a tradition of disarming the intoxicated, this Court must assess the burden these laws imposed on the right to armed self-

---

[8] The United States' examples of twentieth-century laws are less relevant to determining the scope of the Second Amendment right to individual armed self-defense.[8] *See Bruen*, 597 U.S. at 27-28. While these laws are not directly relevant to the inquiry at hand, this Court does note that twentieth-century state laws prohibited the sale of firearms to certain categories of people—including those convicted of a crime of violence, drug addicts, and habitual drunkards. Unlike § 922(g)(3), however, the individuals within these categories were not themselves barred from possessing or carrying firearms under these laws. *See, e.g.,* 1931 Penn. Laws 499, no. 158 § 8 ("Section 8: No person shall deliver a firearm to any person under the age of eighteen, or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, a habitual drunkard, or of unsound mind."); 1932 D.C. 47 Stat. 652 § 7; 1936 Ala. Laws 52, no. 82 § 8; 1935 S. Dak. Sess. Laws 356 Ch. 208 § 8; 1935 Wash. Sess. Laws 601, ch. 172 § 8.

defense and the justification of the burden. *See Bruen*, 597 U.S. at 29. The United States argues that § 922(g)(3) disarms a "limited, narrowly tailored specific group," like the historical laws it cites. ***See* doc. 91 at 3.** Taking a closer look at the historical laws cited by the Government, the burden imposed on the individual right to bear arms by those laws is much narrower than the broad sweep of § 922(g)(3).

The 1655 Virginia law prohibited the shooting of guns to protect the security of the colony—by limiting extraneous gunshots, the colony preserved precious gunpowder and limited the chance that gunfire would drown out warning shots of an impending Native American attack. 1655 Va. Acts 401, Acts of March 10, 1655. It did not, however, remove the ability of individuals to possess or even carry firearms while intoxicated. *Id.* The 1771 New York Act infringed on the individual right to self-defense narrowly: all persons, not just those who were drunk, were barred from *shooting* firearms for the three days around the New Year's holiday to prevent damage caused by boisterous drinking. 1771 Colonial Laws of New York (emphasis added). The statute did not otherwise infringe on the individual's right to carry firearms during that timeframe.[9] *Id.* Finally, the 1746 New Jersey law allowed commanding officers to disarm soldiers who used abusive language against their superiors or appeared "disguised in Liquor" to maintain an orderly militia. 1746 N.J. Gen. Assemb. Law, section 3. The law did not apply to civilians, who were free to possess firearms while intoxicated. *Id.* Based on these examples, the Founders' intrusions on the Second Amendment focused on avoiding property damage, conserving resources, and maintaining an orderly militia rather than public safety concerns, and

---

[9] *Harrison*, 654 F. Supp. 3d at 1203 ("And it is difficult to see how this law could indicate any sort of "well-established," constitutionally relevant tradition of regulation: The law was in effect for only two years, applied to only certain places in one county and two towns, and restricted the discharge of firearms for only three days a year.")

therefore infringed on the individual right to bear arms under extremely narrow circumstances. *See Bruen*, 597 U.S. at 28-29.

The Government's Reconstruction-era examples, while closer to the restrictions posed by § 922(g)(3), "took place 75 years after the ratification of the Second Amendment" and therefore "do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 37. Moreover, the Reconstruction-era historical regulations focused on preventing intoxicated people from carrying, not possessing, firearms while drunk in public spaces, unlike § 922(g)(3)'s wholesale dispossession of habitual drug users. *See, e.g.,* 1868 Kan. Gen. State., Crimes & Punishments § 282; 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws § 1; 1883 Wis. Sess. Laws 290, ch. 329 § 3; 1890 Okla. Sess. Laws 495, art. 77 § 4; 1899 S.C. Acts 97, no. 67 § 1. None of the Reconstruction-era statutes barred the possession of firearms at home or based on an individual's status as an alcohol addict.[10] *Id.* While the post-Civil War laws were similarly concerned with the potential danger to the public posed by individuals who were actively intoxicated, these laws largely maintained the core protections of an individual's right to self-defense. *See Harrison*, 654 F. Supp. 3d at 1202-1203.

Finally, the Government's examples of 1930s-era statutes prohibiting the sale of firearms to people "known to be addicts" have low relevance to this Court's *Bruen* inquiry for two reasons. *See, e.g.,* 1931 Penn. Laws 499, no. 158 § 8; 1932 D.C. 47 Stat. 652 § 7; 1936 Ala. Laws 52, no. 82 § 8; 1935 S. Dak. Sess. Laws 356 Ch. 208 § 8; 1935 Wash. Sess. Laws 601, ch. 172 § 8. First, while the justification of these laws focused on public safety, the focus of the laws

---

[10] The 1878 Mississippi statute bars the sale of deadly weapons to persons "in a state of intoxication" but does not limit the ability of citizens, regardless of how intoxicated they are, to possess firearms. The 1868 Kansas, 1889 Missouri, and 1883 Wisconsin statutes prohibit an individual from *carrying* a gun or other deadly weapon on their person while publicly intoxicated but do not otherwise bar them from possessing firearms. 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws § 1; 1883 Wis. Sess. Laws 290, ch. 329 § 3.

was preventing the sale of firearms to risky categories of people: those convicted of a crime of violence, drug addicts, habitual drunkards, or people of unsound mind. *Id.* Second, these laws were passed nearly 150 years after the Second Amendment was ratified by colonies, making them an ancillary historical source under *Bruen*. *See* 597 U.S. at 34; *Heller*, 554 U.S. at 634-635.

While the United States need only provide historical analogues—not a "dead ringer" or "historical twin"—the regulations cited by the Government fail *Bruen's* metrics for assessing whether they are part of this nation's history and tradition of regulating firearms. *See* 597 U.S. at 28-29. The Government's examples only narrowly and circumstantially burden an intoxicated individual's right to self-defense in contrast with § 922(g)(3)'s blanket prohibition on habitual drug users possessing firearms. *See id.;* 18 U.S.C. § 922(g)(3). The United States also contends that the justification for § 922(g)(3)—to keep firearms out of the hands of irresponsible and presumptively risky groups of people—matches the justifications of historical laws. **Doc. 61 at 18-19.** However, there was a myriad of justifications for these intrusions on an individual's Second Amendment rights, including protecting a colony's safety, maintaining an orderly militia, and minimizing the safety risks of an armed, intoxicated individual carrying a firearm in a public place. *See, e.g.*, 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York; 1746 N.J. Gen. Assemb. Law, section 3; 1878 Miss. Laws 175-76 § 2; 1883 Mo. Laws § 1; 1883 Wis. Sess. Laws 290, ch. 329 § 3. Therefore, this Court finds that the historical regulation of the intoxicated is not an appropriate analogue to the disarmament of habitual users of controlled substances under § 922(g)(3).

### C. *Historical analogues that disarm other disfavored and dangerous groups*

Finally, the United States analogizes § 922(g)(3)'s disarmament of habitual drug users with a "robust historical tradition of legislatures disarming classes of people they deem

dangerous or untrustworthy." **Docs. 61 and 8-15; 91 at 4-5.** The Government further argues that

habitual drug users are a presumptively risky group that Congress disarmed for similar reasons.

See *id.* As examples of this robust tradition, the United States cites seventeenth-century English

laws that allowed for the disarmament of persons "judge[d] to be dangerous to the Peace of the

Kingdome," Catholics, and other "lawless, wicked, and disaffected persons." Militia Act, 14 Car.

II ch. 3 § 13, 5 (1662); 1 W&M, ch. 15, § 3, 6 (1698); 19 Geo. II ch. 39 (1746). The Government

argues that these attitudes were later mirrored by colonial legislatures, which passed laws

disarming "dangerous" classes of people, including enslaved people, Catholics, and those that

were "disaffected to the cause of America,"[11] and that these attitudes persisted through

Reconstruction.[12]

---

[11] *See, e.g.*, 52 Archives of Maryland 454 (1756) (ordering the confiscation of " all such Armour, Gunpowder, and Ammunition, of whatsoever Kinds, as any Papist whatever, within this Province, hath or shall have in his House or Houses…"); An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (1756), THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619, VOL. VII, at 37 (1820) (criminalizing Catholic gun ownership and calling for the forfeiture of weapons, but allowing the possibility of keeping firearms at home for individual self-defense if approved by a justice of the peace); 5 The Statutes at Large of Pennsylvania from 1682 to 1801, 627 (WM Stanley Ray ed., 1898)). 1692-1693 Mass. Act. Ch. 18 53 (empowering justices of the peace to confine and disarm all "affrayers, rioters, disturbers or breakers of the peace"); 1696-1701 N.H. Laws 15; An Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (empowering officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess."); An Act of Dec. 17, 1792, ch. 41, 1792 Va. Acts, reprinted in 1 THE STATUTES AT LARGE OF VIRGINIA 122, 123 (Samuel Shepherd 1835 (§§ 8-9) (barring free black citizens or enslaved people from keeping or carrying "any weapon whatsoever, offensive or defensive"); ACT X, An act for preventing Negroes Insurrections, AT A GENERALL ASSEMBLIE, BEGUNNE AT JAMES CITTIE THE EIGHTH DAY OF JUNE, 1680, in Laws of Virginia, Volume 2, at 481 ("That no slave go armed with a gun, sword, club, staff, or other weapon"); 4 Journals of the Continental Congress 205 (March 1776) ("recommended that states pass laws that "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America."); 1776 Mass. Laws at 479-480; 1776 R.I. Laws at 566-567; 1777 N.C. Laws at 229-231.

[12] *See, e.g.,* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) ("[E]ven the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace. If he refused he would be liable to imprisonment."); Cong. Globe, 39th Cong., 1st Sess. 908-909 (1866) (a federal Reconstruction order for South Carolina stating, "The constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed… No one shall bear arms who has borne arms against the United States, unless he shall have taken the amnesty oath prescribed in the proclamation of the President of the United States, dated May 20, 1865, or the oath of allegiance, prescribed in the proclamation of the President, dated December 8, 1863, within the time prescribed therein. And no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms.").

"[F]ounding-era legislatures categorically disarmed groups whom they judged to be a threat to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir.) (Barrett, J., dissenting) (abrogated by *Bruen*, 597 U.S. 1 (2022)). While courts recognize that "status-based regulations of this period are repugnant (not to mention unconstitutional),"[13] they do demonstrate that "colonial history furnishes numerous examples in which full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—were disarmed due to conduct evincing inadequate faithfulness to the sovereign and its laws." *Range v. Att'y Gen. United States*, 53 F.4th 262, 276 at n.18 (3rd Cir. 2022) (per curiam), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3rd Cir. 2023). *See, e.g.*, 1776 Mass. Laws at 479-480; 1776 R.I. Laws at 566-567; 1777 N.C. Laws at 229-231; 1777 N.J. Laws 90 (requiring those "disaffected to the cause of America" to be disarmed unless they swore an oath of loyalty to their colony). *See also* 52 Archives of Maryland 454 (1756); 1756 Va. Laws at 37; 5 The Statutes at Large of Pennsylvania from 1682 to 1801 at 627 (criminalizing Catholic gun ownership). However, "to understand the principles that animate the Second Amendment, the Supreme Court requires us to look to our grim past to determine the scope of the right to bear arms." *United States v. Brown*, 2023 WL 4826846 *11 (D. Utah July 27, 2023).

To determine whether these historical laws coalesce on a tradition of disarming the distrusted categories of people, this Court must assess the burden these laws imposed on the right to armed self-defense and the justification for that burden. *See Bruen*, 597 U.S. at 29. The burden imposed on the right to bear arms by colonial legislatures was substantial and sometimes absolute; groups of people outside of the political class (notably enslaved people) were disarmed

---

[13] *See also* Joyce Lee Malcolm, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 140-41 (1994).

permanently and without any avenue to regain that right in the future. *See, e.g.,* An Act of Dec. 17, 1792, 1792 Va. Acts. ch. 41. For groups considered dangerous within the political class—*i.e.*, Catholics and those whose loyalty to America was dubious—the infringement on the individual right to bear arms was severe: permanent disarmament lifted only if the individual signed a loyalty oath to their government. *See, e.g.*, 1776 Mass. Laws at 479-480; 1776 R.I. Laws at 566-567; 1777 N.C. Laws at 229-231; 1777 N.J. Laws 90. *See also* 52 Archives of Maryland 454 (1756); 1756 Va. Laws at 37; 5 The Statutes at Large of Pennsylvania from 1682 to 1801 at 627. While these laws targeted different categories of people, the justification was the same: the legislatures identified these groups as dangerous to public safety, untrustworthy, or otherwise unfit to bear arms. *Kanter*, 919 F.3d at 458; *Bruen*, 597 U.S. at 28-29.

While these historical regulations are not an exact historical twin to the burden imposed by § 922(g)(3), the Court finds that they are sufficiently numerous and analogous to weather Mr. Montoya's facial challenge to the constitutionality of § 922(g)(3). *See Bruen* 28-29, 34, 46. The harsh disarmament of people based on their religious or racial status—while unacceptable by today's societal and constitutional standards—demonstrates that colonial legislatures had no issue with removing Second Amendment rights from categories of people they found to be dangerous or "presumptively risky." *Kanter*, 919 F.3d at 458. This parallels the legislative justification for § 922(g)(3): that individuals who habitually use drugs are irresponsible, presumptively risky, and may pose a future threat to society if armed. *See, e.g.*, S. REP. NO. 90-1501, at 22; *Dickerson*, 406 U.S. at 112-113 n.6.

Moreover, while these intrusions on the right to bear arms were substantial, individual members of these distrusted groups could often regain their right to bear arms by signing a loyalty oath. *See, e.g.*, 1776 Mass. Laws at 479-480; 1776 R.I. Laws at 566-567; 1777 N.C. Laws

at 229-231; 1777 N.J. Laws 90. Similarly, the habitual drug users disarmed by § 922(g)(3) can regain their Second Amendment rights as soon as they stop engaging in the conduct that makes them presumptively risky: using drugs. *See Reed*, 114 F.3d at 1071; *Morales-Lopez*, 92 F.4th at 945; *Edwards*, 540 F.3d at 1162. The justification for these laws mirrors the reasoning contained in § 922(g)(3)'s legislative history: that members of these categories of people are "presumptively risky" and, if armed, may pose a threat in the future. *See Brown*, 2023 WL 4826846 at *11. The Court finds that the Government has met its burden in demonstrating that disarming presumptively risky people, like habitual drug users, is part of this nation's history and tradition of firearm regulation.

### III.     § 922(g)(3) is constitutional as applied to Mr. Montoya.

In the supplemental briefing ordered by this Court, Mr. Montoya argues for the first time that 18 U.S.C. § 922(g)(3) is unconstitutional as applied to him because "the Government has not met its burden to demonstrate that our nation has a history and tradition of curtailing the firearm rights of persons who unlawfully use prescription medications." **Doc. 99 at 9.** To make a successful as-applied challenge to § 922(g)(3), Mr. Montoya must demonstrate that the law is unconstitutional as applied to his specific circumstances: as an unlawful user of a prescribed controlled substance. *See Carel*, 668 F.3d at 1217; *N.M Youth Org.*, 611 F.3d at 677 n.5. For the sole purpose of arguing his motion, Mr. Montoya stipulates that he is an unlawful user of suboxone to be subject to § 922(g)(3). **Doc. 99 at 9.** In his briefings, Mr. Montoya also makes no specific arguments about why this Court should treat the unlawful use of prescribed controlled substances differently than the illegal use of other controlled substances. ***See generally*** **51; 74; 99.**

18 U.S.C. § 922(g)(3) prohibits the possession of firearms by any person who is an unlawful user of or addicted to any controlled substance. Suboxone is one of the trade names for buprenorphine, a narcotic opioid controlled in Schedule III of the Controlled Substances Act. *See Buprenorphine Information Sheet* (May 2022). Buprenorphine has legitimate medical uses—mainly treating pain and addiction to other opioids—but is also a potent narcotic in its own right. *Id.* Buprenorphine is "capable of producing significant euphoria," causes symptoms such as respiratory depression and sedation, and "has gained popularity as a heroin substitute and as a primary drug of abuse." *Id.* These symptoms result in the same physiological symptoms and loss of control that make the possession of firearms by habitual drug users so dangerous. *See id;* 18 U.S.C. § 922(g)(3); S. REP. NO. 90-1501, at 22; *Dickerson*, 406 U.S. at 112-113 n.6. Medical professionals must prescribe and closely monitor an individual's use of buprenorphine. *See Buprenorphine Information Sheet*. Therefore, regardless of whether suboxone can be legitimately prescribed, its unlawful use carries many of the same risks as the use of other controlled substances. *Id.*

This Court finds that there is no meaningful difference between the unlawful use of a prescription medication like suboxone and other controlled substances under § 922(g)(3).[14]

---

[14] Even if Mr. Montoya was legitimately prescribed suboxone, the record suggests that he was a habitual user of other non-prescription controlled substances when he possessed the firearms in question. At the time of his arrest, Mr. Montoya was on probation for numerous felony offenses, including possessing and trafficking heroin. ***See* doc. 15.** While in custody, Mr. Montoya was found with suboxone, heroin, and cocaine seven days after probation officers arrested him, resulting in a criminal complaint. ***See* doc. 71-1 at 3.** The Defendant also testified to the following at an evidentiary hearing on Defendant's motions to suppress evidence and dismiss the indictment for pre-indictment and post-indictment delay:

> Q. And prior to that time, at the time of your arrest, were you doing drugs at that time?
> A. Yes, sir.
> Q. And did that continue while you were [in custody]?
> A. Yes, sir.
> Q. Approximately how much in the way of drugs and what kind of drugs were you using?
> A. Mostly heroin, methamphetamine, but also Suboxone. Maybe not as much as I was using on the streets, but I was still using a lot every day.
> Q. And how would you ingest those drugs or use those drugs?

Because Mr. Montoya has not made any specific arguments that differentiate the unlawful use of prescription medication from other controlled substances, this Court denies his as-applied challenge to § 922(g)(3). ***See* docs. 51; 74; 99**; 18 U.S.C. § 922(g)(3); *Carel*, 668 F.3d at 1217; *N.M Youth Org.*, 611 F.3d at 677 n.5.

## CONCLUSION

For the reasons above, the Defendant's Motion to Dismiss the Indictment (**Doc. 51**) is **DENIED.**

**IT IS SO ORDERED.**

                                                      /s/
                                        _____
                                        KEA W. RIGGS
                                        UNITED STATES DISTRICT JUDGE

---

A. Inject.

**Docs. 53; 55; 110 at 80.**

Based on all these factors, the United States has sufficiently demonstrated evidence of a temporal nexus between Mr. Montoya's firearm possession and drug use to defeat his as-applied challenge. ***See id.***; *Edwards,* 540 F.3d at 1162.